78 So.2d 838

**Successions of Mr. and Mrs. Isaac T. RHEA.**

**No. 41971.**

Feb. 14, 1955.

Rehearing Denied March 21, 1955.

◆

Charles L. Rivet, Bertrand I. Cahn, Asst. Atty. Gen., for defendant-appellant.

Ainsworth & Ainsworth, Robert A. Ainsworth, Jr., Fishman, Reuter, Rosenson & D'Aquin, Leonard H. Rosenson, New Orleans, Lewis Rhea Baxter, Jacksonville, Fla., for plaintiff-appellee.

PONDER, Justice.

Mrs. Louise Rhea Baxter, administratrix of the successions of Mr. and Mrs. Isaac T. Rhea, brought a rule to show cause in the Civil District Court against the Inheritance Tax Collector for the Parish of Orleans asking the court to fix the inheritance tax due the State of Louisiana in the sum of $1,052.93, alleging that the decedents were residents and domiciled in the State of Tennessee. In answer to the rule, the Inheritance Tax Collector alleged that the decedents were domiciled in Louisiana and asked for judgment in his favor for the sum of $29,012.93 on the succession of the late Isaac T. Rhea, and for the sum of $138,131.99 on the succession of Mrs. Isaac T. Rhea. After hearing the evidence, the trial court arrived at the conclusion that the decedents were domiciled in Tennessee and made the rule absolute and fixed the inheritance tax due the State of Louisiana in the sum of $1,052.93. The Inheritance Tax Collector for the Parish of Orleans has appealed.

Mrs. Isaac T. (Posey Blanker) Rhea died in Memphis, Tennessee on September 4, 1952. Shortly thereafter her husband, Isaac T. Rhea, died on October 2, 1952 in Memphis, Tennessee. Isaac T. Rhea was born in Davidson County, Tennessee on June 8, 1877. Posey Blanker, his wife, was born on May 10, 1892 in Shelby County, Tennessee. In the year 1919, Isaac Rhea and Posey Blanker were married in New Orleans and established their domicile at 730 South Carrollton Avenue in the City of New Orleans. On February 23, 1939, Mrs. Rhea purchased property at 1415 Exposition Boulevard in New Orleans and she and Mr. Rhea then moved to this address. The home on South Carrollton Avenue was sold on April 29, 1949. The decedents continued to live at 1415 Exposition Boulevard until March of 1946 when Mr. Rhea received word that his sister had passed away in Nashville, Tennessee and he and his wife left New Orleans to attend the funeral. While there Mr. Rhea became ill and accompanied his wife to a cottage in Monteagle, Tennessee which was owned by his wife. They resided there until September 1946 at which time Mr. Rhea was taken to Baptist Hospital at Memphis, Tennessee. He remained in the hospital for two weeks and was sent to Highland Hospital, Asheville, North Carolina for further treatment. He left the hospital on December 7, 1946 and he and his wife registered at the Battery Park Hotel, Asheville, North Carolina

where they lived for approximately three years.

On February 1, 1949, the decedents went to Memphis, Tennessee and Mrs. Rhea entered into an agreement to purchase the Firestone Estate located at Germantown, Tennessee. Shortly thereafter, they returned to Battery Park Hotel, Asheville, North Carolina. Mrs. Rhea consummated the sale of the Firestone Estate on April 28, 1949. On August 15, 1949, the Rheas moved to the Firestone Estate and resided there until their death in 1952. On July 27 and 28, 1949 a portion of the furniture, silverware, china, glassware, linens and clothing were shipped to their residence at the Firestone Estate from New Orleans. The stocks, bonds and jewelry owned by Mr. and Mrs. Rhea were kept in a safe that was located at 1415 Exposition Boulevard. This safe, with its contents, was shipped to Germantown, Tennessee in July of 1949. This contained 451.6 shares of the Preferred Stock of Mente & Company and 7,469.4 shares of the Common Stock of Mente & Company owned by Isaac T. Rhea. In August, 1949, Inez Hamilton, employed as a cook at the residence on Exposition Boulevard went to the Firestone Estate to perform similar duties. In November, 1949, Lillie Belle Larrie, Mrs. Rhea's personal maid, also went to live on the Firestone Estate to become Mrs. Rhea's maid. Two Boston bull dogs, pets of the Rheas, were sent to Germantown, Tennessee in September of 1949. In October, 1949, the Firestone Estate was re-named "Rhea Farms". At the time that Inez Hamilton, the cook, and Lillie Belle Larrie, the maid, were asked to come to Germantown, Tennessee by Mrs. Rhea, she employed one Irenne Larrie and one Flem Webb to care for the premises at 1415 Exposition Boulevard, which they did until June, 1950 when the house was closed. From February, 1948 through May, 1950, the premises at 1415 Exposition Boulevard were occupied by Mr. J. Lucius McGehee and his family. Mr. McGehee was a godchild of Mrs. Rhea. On June 30, 1950, the property at 1415 Exposition Boulevard was sold and the remainder of the furniture and personal belongings of the Rheas was shipped to Rhea Farms in Tennessee. In 1950, Mr. Rhea opened a personal savings account in the First National Bank of Memphis, Tennessee and Mrs. Rhea opened a checking account in the same bank during that year. Both wills of decedents were found in Tennessee at the death of the Rheas. The Rheas kept seven automobiles at Rhea Farms, three of which carried Tennessee license plates and four of which carried Louisiana license plates. Isaac T. Rhea was a member of and paid dues in the following organizations: Tennessee Club, Memphis, Tenn., in which he owned stock; New Orleans Country Club, New Orleans, La., in which he owned stock; The Stratford Club, New Orleans, La.; The Southern Yacht Club of New Orleans, New Orleans, La.; The New Orleans Athletic Club, New Orleans, La.; The Pass Christian Yacht Club, Pass

Christian, Mississippi; The Mystic Club, New Orleans, La.; The Rex Carnival Club, New Orleans; The International House, New Orleans; The Greater New Orleans Chamber of Commerce; Fairgrounds Corporation, New Orleans. Mrs. Rhea was a member of the following organizations: Dillettante's Club, Memphis, Tennessee; New Orleans Country Club, and the Orleans Club, New Orleans. Isaac T. Rhea made substantial contributions to charity, including contributions to the following churches: St. George's Episcopal Church, Germantown, Tennessee; Catholic Church, Memphis, Tennessee; Protestant Church, Pass Christian, Mississippi; Catholic Church, Pass Christian, Mississippi. After the death of Rhea, his safety deposit boxes in the Whitney National Bank of New Orleans at the Main Office and the Carrollton Branch were opened and found to be empty. At the time of his death, Rhea had a balance in his checking account at the Whitney National Bank in New Orleans in the amount of $12,502.16; Mrs. Rhea at the time of her death had a balance in a checking account of the Carrollton Branch of the Whitney Bank of New Orleans in the amount of $16,689.79, and a balance in her checking account in the First National Bank in Memphis of $24,206.68. At the time of his death Isaac Rhea owned 95,045.4 shares of the 100,000 shares of common stock issued in Mente & Company, of which he was President, and he also owned 6,764.7 of the 7,000 shares

of preferred stock of Mente & Company. At his death, the safe at Mente & Company was found to contain 6,233.5 shares of the preferred stock and 87,576 shares of the common stock owned by Isaac Rhea. From the time he left New Orleans in March, 1946, until he died, Isaac Rhea kept in touch with Mente & Company as far as his health would permit, by long-distance telephone calls and frequently by the use of the mails.

Mr. and Mrs. Rhea paid both Federal and State income tax in Louisiana from 1947 to 1951 inclusive.

After the death of the Rheas, Mrs. Louise Rhea Baxter qualified as administratrix of the successions of the decedents in proceedings in the court of Shelby County, Tennessee.

Dr. William W. Taylor, a physician who treated Mr. Rhea for his illness in Tennessee, testified that Mr. Rhea told him that he definitely did not want to establish his residence in Tennessee because he felt that his estate would be liable for inheritance tax in both Louisiana and Tennessee when he should die.

While the evidence shows that Mr. Rhea was treated from time to time while he was in Tennessee yet there were times when he was physically able to return to Louisiana if he had desired to do so.

Max N. Tobias testified that he visited the Rheas in Tennessee and that Mr. Rhea

told him that he had left New Orleans permanently and was not coming back.

Dr. Alton Oschner testified that he visited the Rheas some time in 1950 at Rhea Farms and that Mr. Rhea told him that "he wasn't planning on coming back anymore." "He wanted to stay right there." Dr. Oschner also testified that on several occasions he suggested to the Rheas that they come back to New Orleans because he thought it would be conducive to Mr. Rhea's health.

Mrs. Katherine Mahen, Mr. Rhea's personal secretary at Mente & Company in New Orleans, testified that Mr. Rhea told her that Rhea Farms was bought as an investment and that he never claimed Tennessee as his domicile. She testified that Rhea wrote her letters and asked her to write to Mayor Morrison about his registering for him because he did not want to lose his right to vote in Louisiana. It appears from the record that Isaac Rhea had not registered to vote in Louisiana since the year 1943. Mrs. Mahen testified that Mr. Rhea wrote her asking to have his Louisiana automobile licenses renewed and stated that when his health would permit he wanted to return to New Orleans. She testified that sometime in 1951 she received a personal tax notice from the City of New Orleans and wrote Mr. Rhea asking him to advise her what to do. He replied stating that she should notify the authorities that all of his personal belongings had been moved to Tennessee, that his home here in the city had been sold and that his present address was Rhea Farms, Tennessee. She testified further that everything of value owned by Mr. Rhea had been moved to Tennessee except some of the Mente stock and insurance policies which she kept for him.

Mr. Irving R. Saal withdrew as attorney for the administratrix because he was definitely of the opinion that Mr. Rhea's domicile was in the State of Louisiana; however, we find in the record correspondence of Mr. Saal, a public accountant, Mr. Rhea and others, and all of those letters indicate that the parties were concerned about the amount of income tax that the Rheas were to pay and the inheritance tax that would come due upon death. It seems from this correspondence that the parties were under the impression that Mr. Rhea could determine at his wish the place of his domicile.

There is a letter in the record from Mr. Rhea to his accountant, dated August 12, 1950, wherein he asked the accountant to "tell the (Louisiana) collector if (tax) not reasonable will pay no La. (Louisiana) tax in future for you know haven't been in La. (Louisiana) for several years and could take up residence in Tenn. (Tennessee)—N. C. (North Carolina) or Nevada or elsewhere at my pleasure * * *."

From all of this correspondence, it appears that the parties were under the im-

pression that Mr. Rhea could designate the place of his domicile without regard to the actual facts. It further appears to us that all this controversy over Mr. Rhea's domicile was with the view of lessening his liability for taxes.

During the six-year period from 1946, the time Rhea left Louisiana, until his death in 1952, he never returned to Louisiana, not even for a visit, and he and his wife were both buried in Elmwood Cemetery in Memphis, Tennessee. Although Mrs. Rhea made three or four trips to New Orleans after her departure in March of 1946, she was never accompanied on these visits by her husband.

The general definition of domicile is given in Article 38 of the LSA–Civil Code as follows: "The domicile of each citizen is in the parish wherein he has his principal establishment. The principal establishment is that in which he makes his habitual residence; if he resides alternately in several places, and nearly as much in one as in another, and has not declared his intention in the manner hereafter prescribed, any one of the said places where he resides may be considered as his principal establishment, at the option of the persons whose interests are thereby affected."

Article 41 of the LSA–Civil Code provides: "A change of domicile from one parish to another is produced by the act of residing in another parish, combined with the intention of making one's principal establishment there."

Article 46 of the LSA–Civil Code provides: "Domicile once acquired shall not be forfeited by absence on business of the State or of the United States, but a voluntary absence of two years from the State, or the acquisition of residence in any other State of this Union, or elsewhere, shall forfeit a domicile within this State."

In our review of the jurisprudence, we find a number of cases where parties had two or more residences. Some of the cases are: McFatter v. Beauregard Parish School Board, 211 La. 443, 30 So.2d 197; In re Adoption of Rials, 220 La. 484, 56 So.2d 844; First National Bank of Lumberton, Miss. v. Hinton, 123 La. 1018, 49 So. 692; Hill v. Spangenberg, 4 La.Ann. 553; Le Blanc v. Loughridge, 153 La. 109, 95 So. 419. But these cases are of no aid because the Rheas had only one residence at the time of, and more than two years prior to, their deaths. They habitually lived in this residence until their death, in fact it was their home. They had sold their residence in New Orleans and moved all of their personal property to Rhea Farms. Their domicile was in this place where they had their principal establishment, that is their habitual residence or, in plain English, "home". Oglesby v. Turner, 127 La. 1093, 54 So. 400.

A change of domicile is brought about by the actual residing in another

place with the intention of making it the principal establishment or home. The main question for us to decide in this case is where was the Rheas' home or in the language of the Code their principal establishment?

▮▮ While the presumption of original domicile continues until fixed elsewhere, whenever a person has acquired a residence elsewhere and actually resides there this will be presumed to be his domicile until the contrary is shown. Succession of Steers, 47 La.Ann. 1551, 18 So. 503; Kastel v. Commissioner of Internal Revenue, 5 Cir., 136 F.2d 530. The presumption arising from actual residence in a place is that the party intends to remain there. In other words, where a person lives is taken prima facie to be his domicile until the facts show the contrary.

The Rheas were voluntarily absent from the state for more than two years having sold their residence here and they actually established a residence in Tennessee where they habitually lived with all of the comforts of life. We realize that where a person maintains more than one establishment that it is often difficult to determine which establishment is the domicile but where a person maintains and actually lives in only one residence it would appear to us that that is his domicile. The fact that the Rheas may have entertained a floating intention to return to Louisiana at some future date is immaterial. Succession of Webre, 172 La. 1104, 136 So. 67, and authorities cited therein.

▮▮ The acts and conduct of the parties speak louder than words when it comes to a determination of domicile. As stated in Stine v. Moore, 5 Cir., 213 F.2d 446, 448: "Residence in fact, and the intention of making the place of residence one's home, are essential elements of domicile. Words may be evidence of a man's intention to establish his domicile at a particular place of residence, but they cannot supply the fact of his domicile there. In such circumstances, the actual fact of residence and a real intention of remaining there, as disclosed by his entire course of conduct, are the controlling factors in ascertaining his domicile. As stated by Mr. Justice Stone: 'When one intends the facts to which the law attaches consequences, he must abide the consequences whether intended or not.' State of Texas v. [State of] Florida, 306 U.S. 398, 425, 59 S.Ct. 563, 576 [830], 83 L.Ed. 817."

In the Succession of Franklin, 7 La.Ann. 395, a leading case, the largest portion of deceased's fortune was in Louisiana where his plantation was situated. He voted in this state and executed a declaration of intention to change his domicile from Tennessee to Louisiana. The court held that he was a resident and domiciled in Tennessee because he had erected a family residence in Tennessee. The court in commenting on the declaration of intention

to change the domicile said this act was controverted by subsequent acts such as the erection of the residence in Tennessee and that the object of the declaration was no doubt to evade the law in regard to the sale of certain slaves. The court then stated: "The law which fixes the domicile of each citizen at the place where his principal establishment is situated, means the principal domestic establishment, not that where he may have the largest portion of his fortune. Art. 42 C.C." The court quoted from the French authorities to the effect "that a place where a person exercises his political rights, and where the bulk of his property is situated, is not reputed his place of domicile, if that person, having a dwelling house elsewhere, habitually occupies it; and pays there his taxe personelle et mobiliere."

In the case of Watson v. Simpson, 13 La.Ann. 337, the defendant was domiciled in New York; he moved to New Orleans and established a business and resided there with his family. Upon the death of his wife, he broke up housekeeping and returned to New York where he remained two years without returning to New Orleans, although he kept an office in New Orleans. He maintained a post office box in New Orleans and purchased goods for his New Orleans store. He took a lease on a residence in New York in the name of his brother for the purpose of not impairing his right to a Louisiana domicile.

He resided in this residence in New York until he returned to New Orleans with the intention of selling his property here. He told all of his friends that he was a resident of New Orleans and kept a large stock of goods here. The court found that the defendant was a resident of New York and that he had built up a fictitious domicile in Louisiana to protect his goods from attachment. The court stated in that case "that courts of justice must look to the real facts of the case and where it appears that the declarations of the party are made with reference to making testimony in his favor they must be rejected."

In the case of Walker v. Barrelli, 32 La.Ann. 467, the court held that the defendant had forfeited her domicile in Louisiana by her voluntary absence from the state despite the fact that she left a servant in charge of a residence in Louisiana.

In the case of Hyman, Lichtenstein & Co. v. Schlenker & Hirsch, 44 La.Ann. 108, 10 So. 623, 625, Mrs. Schlenker, her husband and their family moved from Trinity, Louisiana to New Orleans, bringing with them all of their household effects. Their business in Trinity was discontinued and they established a residence here for about a year and then moved to Natchez, Mississippi carrying all of the household effects. They went into business and established a residence there. The question of domicile was presented and the court stated that "He has reared his children

and married two of them in Natchez. There has been his home. It was not only his principal, but his *only,* domestic establishment." (Italics ours.) While the court discussed the intention of the parties at length yet the above-quoted language shows that the court really decided the case on the fact that the residence in Mississippi was the principal and *only* domestic establishment.

In the case of Marks v. Germania Savings Bank, 110 La. 659, 34 So. 725, 731, Marks was a resident of New Orleans and engaged in business with his father. He married in New York against his father's wishes and discontinued business with his father and lived in New York. He visited New Orleans on occasions. His wife had a bank box in a New Orleans bank, all of their personal belongings and securities were kept in New York. The court held under those circumstances that Marks was domiciled in New York irrespective of the fact that there was evidence in the record that the wife had discussed the furnishing of a home in New Orleans with a furnisher stating: "It was, besides, mere talk; it was not carried into execution; she did not furnish the house; she did not live in it; she did not return to New Orleans." Here again the court looked to the principal and only domestic establishment and did not put much stress on the intention of the parties.

In the Succession of Steers, supra [47 La.Ann. 1551, 18 So. 505], the court made

this pertinent observation: "his declaration and his acts show that he intended to remain for an indefinite period (and), as a place of present fixed domicile, it will constitute his domicile, though he may have had an idea, at some future time, of returning to the original domicile."

As we take it, in establishing domicile the intent is the actual state of facts and not what one declares them to be. The fact that Isaac Rhea made income tax returns in Louisiana and purchased Louisiana automobile license plates and endeavored to register to vote and to renew his automobile licenses here are not sufficient to overcome the clear and positive proof of the fact that the Rheas established a home and actually resided in Tennessee and were voluntarily absent from this state for more than two years.

The evidence with reference to statements made by Rhea as to his intent are so conflicting that they are of no aid. The record shows that the Rheas sold their home in Louisiana, pulled up stakes, and established a home in Tennessee and lived there for more than two years. Such being the case, their domicile was undoubtedly in the State of Tennessee and any floating intention they might have had to return to Louisiana at some indefinite future date is of no moment.

For the reasons assigned, the judgment is affirmed.