131 So.2d 796 (1961)
Givens L. FOREMAN, Plaintiff and Appellee,
v.
Lena L. JORDAN et al., Defendants and Appellants.
No. 65.
Court of Appeal of Louisiana, Third Circuit.
June 19, 1961.
Rehearings Denied July 12, 1961.
*797 Gold, Hall & Skye, by William E. Skye, Alexandria, for defendant-appellant.
Stafford & Pitts, by Grove Stafford, Jr., Alexandria, for 3rd party defendant-appellant and 3rd party plaintiff-appellant.
Bernard Kramer, Alexandria, for plaintiff-appellee.
Gist, Murchison & Gist, by DeWitt T. Methvin, Jr., Alexandria, for 3rd party defendant-appellee.
Before TATE, SAVOY and HOOD, JJ.
HOOD, Judge.
In July, 1957, the plaintiff, Givens L. Foreman, purchased a house in Alexandria from the defendant, Mrs. Lena L. Jordan, for the sum of $11,500. About six months later he discovered extensive termite damage in the house, and as a result of this discovery he instituted this suit against Mrs. Jordan in February, 1958, for a diminution of the purchase price. Mrs. Jordan filed an answer, and she also filed a third party petition impleading Cecil R. Blair, who by *798 contract had agreed to provide termite control services for the house, and Great American Indemnity Company, Blair's surety under the statutory bond required of licensed pest control operators. See LSA-R.S. 40:1268. Blair and Great American Indemnity Company filed an answer to this third party demand, and by means of another third party petition they impleaded Hartford Accident and Indemnity Company, alleging that in the event they are held responsible in damages they are entitled to recover against Hartford under a public liability or manufacturer's and contractor's public liability insurance policy which it had issued to Blair. Plaintiff Foreman then amended his petition, naming Blair, Great American Indemnity Company and Hartford Accident and Indemnity Company as additional parties-defendant.
The trial court rendered judgment on February 5, 1959, sustaining an exception of no cause of action filed by Hartford Accident and Indemnity Company, and dismissing the suit as to that defendant. The case was then tried on its merits, and following that trial judgment was rendered on November 12, 1959, in favor of plaintiff, Foreman, and against the defendant, Mrs. Jordan, for the principal sum of $1,618.50, but the demands of plaintiff and Mrs. Jordan against Blair and his surety, Great American Indemnity Company, were rejected. From these judgments, Mrs. Jordan, Blair and Great American Indemnity Company have appealed.
All appellants contend that the trial court improperly overruled an exception to the jurisdiction ratione personae initially filed by Mrs. Jordan. By this exception, the appellants contend that Rapides Parish was not the proper venue for this suit, instituted in 1958, because Mrs. Jordan left that parish in 1952 and since that time she has resided and worked in East Baton Rouge Parish.
The uncontradicted facts show that Mrs. Jordan lived in Alexandria, in the residence building sold to the plaintiff, until March of 1952, when (following the death of her husband) she moved to Baton Rouge where she has been employed as a house mother by a social fraternity at Louisiana State University. In 1956 she registered to vote in East Baton Rouge Parish. From 1952 until the middle of 1957 she rented her Alexandria home to tenants, reserving a room in the house during those years to store her furniture. Each year, until February 2, 1957, she applied for and obtained a homestead tax exemption in Rapides Parish, based upon the allegation that this Alexandria residence was her home.
The trial court sustained plaintiff's contention that Mrs. Jordan's domicile remained in Rapides Parish until she sold her Alexandria home in July, 1957, and that since she never executed and recorded a written declaration of change of domicile, as provided by LSA-C.C. Art. 42, she was still subject to suit in Rapides Parish during the year following her removal therefrom. C.P. Art. 167; State ex rel. Jagneaux v. Jagneaux, 206 La. 107, 18 So.2d 913. This suit was instituted less than one year after she sold her home, so accordingly the district court held that it was properly instituted in Rapides Parish.
The trial judge in his written reasons for judgment pointed out that the retention by Mrs. Jordan of her personal room in her Alexandria residence, the somewhat temporary nature of her employment in Baton Rouge where her meals and room were furnished by the fraternity, and her annual application for homestead exemption benefits in Rapides Parish, all tended to disprove an actual intention to change her domicile and to leave Alexandria permanently, even though she actually had been living in Baton Rouge for purposes of employment for several years.
"A residence is one thing and a domicile another. A person may have as many residences as he may choose, but cannot have but one real domicile." Oglesby v. Turner, 127 La. 1093, 1096-1097, 54 So. 400, 402. "A change of domicile is brought about by the actual residing in another *799 place with the intention of making it the principal establishment or home." Succession of Rhea, 227 La. 214, 78 So.2d 838, 842. "The party who seeks to avail himself of a change of domicile bears the burden of proving it. So long as any reasonable doubt remains, the presumption is that it has not been changed. The domicile of origin continues until another is acquired." Succession of Simmons, 109 La. 1095, 1097, 34 So. 101, 102; In re Rials, 220 La. 484, 56 So. 2d 844; 28 C.J.S. Domicile §18, p. 41, et seq. See also Civil Code Articles 38, 41, 42 & 43.
Applying these legal principles to the facts in this case, we cannot say that the trial court erred in holding that Rapides Parish is the proper venue for this suit.
The evidence convinces us, as it did the trial judge, that the plaintiff-buyer is entitled to judgment against the defendant-seller, decreeing a diminution of the purchase price because of the extensive termite damage found in the house which he purchased. These damages constituted latent defects of such a nature that it must be supposed that the buyer would not have purchased it had he known of the vice. Because of this damage and of the seller's implied warranty against such hidden defects, the buyer is entitled to recover the diminution in value of the thing sold attributable to these redhibitory defects. See LSA-C.C. Arts. 2476, 2520, 2521 and 2541.
It is suggested that the buyer should have noticed the termite damage, and that "apparent defects, that is, such as the buyer might have discovered by simple inspection are not among the number of redhibitory vices." LSA-C.C. Art. 2521. Although several expert witnesses, including termite experts, building contractors and an architect, testified that at the time of the sale the termite damage was easily ascertainable on their expert examinations, their special knowledge in that field, obtained from their specialized training and experience, cannot be attributed to the plaintiff-purchaser here. See Ruehmkorf v. McCartney, La.App. 2 Cir., 121 So.2d 757, certiorari denied. Both the buyer and the seller's real estate agent, who had negotiated the sale of the house to him, testified that these defects were not apparent to the untrained eye. The experts, in fact, testified that the major portion of the termite damage could not be detected without crawling under the house and probing with a screw driver or a sharp instrument, and that some of the termite damage could not be detected without removing portions of the siding on the house, which was done several months after the sale had been completed, but shortly before this suit was instituted. We think the old termite damage to the house was not an apparent defect, such as the buyer might have discovered by simple inspection, but on the contrary it constituted a latent defect warranting a diminution in the purchase price.
Also, we find no error in the trial court's award of $1,618.60, as the amount which reasonably would be required to repair the termite damage. A detailed estimate in a larger amount was furnished by the plaintiff's expert, while similar estimates in smaller amounts were furnished by the appellants' experts. The chief differences lay in a disagreement as to the extent of the replacement of materials and the refinishing which would be required to repair the damage. The award was within the discretion of the trial court, and in our opinion it is supported by the evidence.
The basis of Mrs. Jordan's third party demand against Blair and Great American Indemnity Company, his surety, is (1) Blair's alleged breach of a termite inspection and control contract relating to the Jordan residence, and (2) the alleged breach of a warranty by Blair that the house was not in need of repair, which warranty Mrs. Jordan asserts is contained in an FHA Termite Inspection Report, executed by Blair's employee on April 14, 1957, stating in effect that repair or replacement of any portion of the building was not recommended.
*800 In dismissing Mrs. Jordan's third party demand, the trial judge held that she had failed to prove that the substantial termite damage in this 35-year-old residence building occurred after 1946, the year when Blair first undertook to provide termite control services for this building. The trial court also held that no reliance was placed by Mrs. Jordan on the FHA termite inspection report made by Blair's employee in 1957, and accordingly that she was not damaged in any manner by the statements contained in that report.
The record establishes that on March 26, 1946, plaintiff's husband entered into a contract with defendant Blair, under the terms of which Blair agreed to treat the Jordan residence for the control of subterranean termites, to make semi-annual inspections of the building thereafter, and to give additional treatment at any time during the term of the contract if termite infestation is found. Although this contract was entered into for an initial period of two years, it was renewed from time to time thereafter, so that Blair continued to maintain termite control services for the building under those terms from the date of that original contract until this suit was filed. During that time Blair furnished semi-annual inspections and treatment of the premises as required by the contract.
Although it is suggested that Blair is not liable under the contract for termite damage sustained during the existence of the agreement, defendant Blair himself commendably admitted, and the trial court found, that the object of the services which he agreed to perform under that agreement was "to prevent termite damage." The trial court concluded, correctly we think, that under this contract Blair and Great American Indemnity Company, his surety, would be liable for any failure to prevent termite damage, as agreed and intended by the termite inspection and control contract. Melancon v. Mizell, 216 La. 711, 44 So.2d 826; Ruehmkorf v. McCartney, supra. See also Annotation, "Contracts for eradication or control of termites or other pests or vermin," 43 A.L.R.2d 1237.
Since the evidence establishes the existence of substantial termite damage at the time of the 1957 sale, the principal question presented by the third party demand is whether or not that damage occurred after March 26, 1946, and while the termite control contract between Blair and Mrs. Jordan was in effect. If the damage occurred before the contract was entered into, of course, there could be no liability on the part of Blair or his surety for that damage.
The Jordan house was built in 1922, so it was 24 years old when the termite control contract was entered into. Every expert who testified at the trial agreed that the termite damage in the house was not recent, and that it was extensive enough to have required several years to have occurred. One expert estimated that even without any termite treatment at all a period of from three to seven years would be required for that amount of damage to have been done. All of the experts also agreed that it is impossible from an examination made in 1957 or 1958 to determine when the termite damage occurred, to estimate how long it has been present in the house, or to ascertain whether it occurred before or after 1946.
Defendant Blair is a trained and experienced pest control expert, who has been engaged in general insect, pest and termite control work since 1940. He testified that at the time the contract was entered into in 1946 he made a careful inspection of the house, and found at that time that there was old termite damage and that the house was then actively infested with termites. He thereupon treated it for termites, using the best methods and chemicals then approved by the industry, and from that time until the sale was completed in 1957 he continued to inspect the house semi-annually and to treat it each time he found a reinfestation, all as required by the contract. In his opinion the old termite damage which now exists in the house occurred *801 prior to March 26, 1946, the date on which he began providing termite control services for it. He testified:
"Q. Do you have any opinion as to whether or not termite damage that occurred in that house occurred before or after 1946? A. Based on the experience that I've had with the termites and everything, I would say definitely this damage was caused prior to 1946.
* * * * * *
"Q. You stated a while ago that you would state, as I recall, that in your opinion, this damage occurred prior to 1946? A. That's correct.
"Q. That's your unequivacle statement? A. That's correct. May I explain it?
"Q. You don't think that damage could have occurred by those termites eating on that (indistinct) from 1946 to 1958? A. No, because they did not eat on it constantly during that time, because they have to come to the ground, and when they come to the ground through a mud tunnel, you can find them. Otherwise, if you had missed them, then they would swarm in the house. If they had done that damage from 1946 on, they would have been swarming in that house every year."
Ray Stubblefield, an expert who has been engaged in termite control business for more than ten years, inspected the house in 1958 and again in 1959. In response to an inquiry as to when the termite damage occurred, he testified. "My opinion is that it occurred before 1946." He concedes, however, that this opinion is based on the assumption that semi-annual inspections have been made and that proper treatment has been administered since 1946. The testimony of defendant Blair and his brother, Roy Blair, is uncontradicted to the effect that these inspections were made and proper treatment was given each time the house was found to be re-infested. Although Blair does not have records of his inspections and the treatment of the house prior to 1948, he does have a complete record of the inspections and termite control services he rendered affecting that building since March, 1948. These records confirm his testimony to the effect that inspections were made and treatment was administered regularly, in accordance with the contract.
Tom M. Skinner, a termite inspector employed by the Louisiana Pest Control Commission, examined the house in August, 1958, and found old termite damage but no live termite infestation. He testified that the piers under the house had been drilled, and that there were no wood contacts between the house and the ground, all of which confirms in some measure the testimony of defendant Blair as to the treatment which he administered.
Paul K. Adams, the only other termite expert who testified at the trial, examined the house about in January of 1958, after the siding had been removed. At that time he found active infestation of termites in two places, which he stated were "limited to a small area." He also found old termite damage, but he testified that it was impossible for him to determine when that damage occurred. He was certain that the damage occurred sometime before the house was sold in 1957, but he stated that it was impossible for him to determine whether it occurred before or after Blair first undertook to render termite control services in 1946. Adams further testified that it is common for houses which have been treated to become re-infested with termites, and it is for that reason that periodic inspections for re-infestation are required by the contract. The records kept by Blair show that the two relatively small infested areas found by Adams early in 1958 were treated by Blair on February 2, 1958, and that later inspections revealed no further live infestation.
All of these facts indicate strongly that the termite damage which existed at the time of the sale in 1957, occurred before Blair undertook to render termite control services in 1946. Counsel for Mrs. Jordan *802 argues, however, that since defendant Blair did not have a record of the initial examination which he made in 1946, and since it appears that he did not personally inspect the house from the early 1950's until after the sale in 1957 (the regular inspections during that time being made by Blair's employees), this witness is not in a position to testify that the damage found in 1957 existed eleven years earlier when he began treating the house. We find no merit to that argument, because the record shows that Blair inspected the house a number of times from 1946 until sometime in 1950, and that he again inspected it following the 1957 sale. It appears to us, as it apparently did to the trial judge, that Blair is in a better position than anyone else to know whether or not the existing old ter mite damage occurred prior to 1946.
Counsel for Mrs. Jordan argues that Blair apparently found no substantial termite damage to the house in 1946, since he did not recommend to Mrs. Jordan that repairs be made. Blair testified that he "brought to her attention, as we bring to all peoples' attention, that there was termite evidence there, and also from a damage standpoint, that they were supposed to look into the damage factor." Mrs. Jordan does not contradict this statement, although she says she was not aware of the fact that there was extensive termite damage until after she had sold the property.
On the basis of Blair's uncontradicted statements, therefore, we conclude that in 1946 he informed Mrs. Jordan or her husband, who was living at that time, of the fact that there was then some existing termite damage to the house. If our conclusion in that respect should prove to be wrong, however, we think the mere fact that Blair may not have informed Mr. or Mrs. Jordan of the old termite damage in 1946 would not be sufficient to justify a conclusion that no such damage existed at that time.
The evidence shows that in 1950 the house became re-infested with termites, causing damages to a rug which Blair replaced. In 1956 termites did some slight damage to a bookcase, which Blair immediately repaired. In 1957, Mrs. Jordan's real estate agent reported some "flying ants" on the premises, which Blair immediately investigated, but we interpret the evidence as establishing that they were not termites. Although the house was found to be completely free of infestation in April 1957, two small infested areas were found in the early part of 1958, as has been pointed out, but they were treated immediately and the termites apparently were eradicated because none were found at inspections made a few months later. Blair testified that the house actually became re-infested five times during the eleven or twelve years he serviced it, but that on each occasion only small areas were affected and treatment was administered promptly. From the testimony of the expert witnesses, it appears to us that these few instances of re-infestation do not indicate any fault on the part of Blair, that they might normally be expected while a house is being treated properly under a termite control contract such as existed here, and that the old termite damage found in 1957 could not have occurred while the contract was in force.
After considering all of the evidence, we conclude, as did the trial judge, that the evidence fails to establish that any significant part of the termite damage which existed in 1957 occurred after 1946, or while Blair was rendering termite control services for the building. The evidence, in fact, convinces us that substantially all of the termite damage which existed at the time of the sale occurred before 1946.
Shortly before the house was purchased by plaintiff, Blair was asked to inspect it and to furnish a termite inspection report, pursuant to a requirement of the Federal Housing Authority in connection with the financing of the sale of the property. This inspection was made by one of Blair's employees on April 4, 1957, who certified that at that time there was evidence of pest *803 termite infestation, but that "repair or replacement of any portion of the main or auxiliary structures" was not recommended. Mrs. Jordan contends that this inspection report constituted a "warranty" to her by Blair that no repairs to the house were necessary because of termite damage, that she relied on this warranty in selling the house, and that because of her reliance on that report she is entitled to recover against Blair.
The siding on the house had not been removed at the time Blair's employee made this inspection in 1957, and the evidence shows that much of the termite damage could not be discovered, even by a termite expert, without the removal of that siding. Blair states that if he had personally made the investigation at that time he would not have recommended any repairs, just as was done by his employee, but he concedes that after the siding on the house was removed and he was able to see the full extent of the old termite damage, he now feels that some repairs should be made. The evidence shows, however, that Mrs. Jordan has not been damaged in any way by this termite inspection report. If Blair had torn away the siding and had discovered the extent of the old termite damage prior to the sale, then, of course, Mrs. Jordan would have had to bear the cost of repairing the damage at that time. It is not shown that Mrs. Jordan in any way relied on the FHA Termite Inspection Report in selling the house or in determining the price which she should ask for it, or that the report in any other way operated to her prejudice. It is elementary that no recovery may be had for breach of contract until damages have been proved. In this case Mrs. Jordan has not shown that she was damaged in any way by the termite inspection report issued by Blair's employee on April 4, 1957, even if it should be construed as a "warranty" that the house was not in need of repair.
Although plaintiff, Foreman, also demands judgment against Blair and his surety, the trial judge rejected the demands as to those defendants, and since plaintiff has not appealed we are not called upon to determine whether Blair and his surety are liable to plaintiff.
For the reasons herein set out, the judgment of the trial court is affirmed. All costs of this appeal are assessed to appellant, Mrs. Lena L. Jordan.
Affirmed.
TATE, Judge (dissenting in part).
I concur with the majority opinion, except insofar as it dismisses the defendant seller's, Mrs. Jordan's, third-party demand against Cecil R. Blair, her termite maintenance man.
In 1946, Blair had undertaken to provide a termite control service for the Jordan residence, by a contract which the majority correctly finds made him liable for any substantial termite damage sustained in the residence between 1946 and 1957, the latter being the date of sale of the residence and the date that the Blair termite control contract terminated.
Within five months after the 1957 sale, approximately sixteen hundred dollars of termite damage was found in this ten-thousand dollar residence, involving principally substantial damage to the floor sills leading from the chimney. All experts admitted that this extensive damage antedated the 1957 sale; but, in the writer's opinion, it is virtually impossible that this very extensive damage pre-existed the 1946 contract with Blair, because he admitted that he had inspected the house at that time, and he did not recall nor did his records show that he had called to the attention of the Jordans any particular damage requiring repairs at that time, such as is the ordinary practice in the termite industry.
Unfortunately, Senator Blair was unable to locate his records of the 1946 inspection, which, the evidence shows, termite operators such as he generally maintain permanently and which would have shown definitely whether or not the 1957 damage *804 had existed in 1946. Unfortunately also, this very honest and reputable witness had not gone underneath the Jordan house since 1950, as he is the only witness who could from personal knowledge testify whether the extensive and obvious termite damage found underneath the house in 1958 did actually exist in 1946. Despite these somewhat obvious hurdles to the theory that the extensive termite damage pre-existed the 1946 termite maintenance contract and thus almost 12-years of termite control supposed to have been furnished by Blair, the majority finds that the termite damage existed before 1946 because of the "uncontradicted" testimony by Blair and his employee[1] that the termite inspections and treatment had been properly performed according to the contract, and of Stubblefield, a former associate of Blair's, that, if such treatment was properly performed, then it would have been impossible for the damage to have occurred. It is somewhat as if, following an intersectional collision, one accepted the declarations of both drivers that they were driving carefully and prudently and therefore, without further inquiry, absolved both drivers of any fault in the accident.
For, of course, the very object of the inquiry in this suit is to ascertain whether or not Blair's employee did or did not actually perform properly his termite inspection and treatment duties in accordance with the contract. While his statement that he did is of course entitled to consideration, yet in weighing whether the statement is accurate or not despite its self-serving nature, one must also take into consideration all of the other surrounding facts and circumstances, including the testimony introduced by the other parties. In this regard, the majority opinion does not see fit to mention the testimony of three contractors, an architect, and another entomologist who had examined the house in 1958 to the effect that, even without removal of the siding, the substantial termite damage underneath the house, and observable by for instance the sagging of the floors along the wall inside the house, was obviously noticeable to their expert inspectionwhich leads the writer to the inescapable conclusion that Blair would not have missed it when he inspected the house in 1946, if the damage actually existed at that time, and which also leads to the interesting question of, upon what basis did Blair's employee certify on the FHA termite inspection certificate in 1957, just before the sale, that the premises were not in need of structural repairs, when the floor sills along one side of the house were at that time substantially destroyed by termite damage?
The evidence shows that this 1957 FHA termite inspection certificate was a necessary incident of the financing and therefore of the 1957 sale from the defendant to the plaintiff, and that it was prepared by Blair's firm at the request of the defendant's real estate agent. Although of course neither the plaintiff nor the defendant personally read this certificate, it is obvious that the attorneys for the buyer, seller, and lender did so to be sure that a necessary condition of the sale was satisfied, and that both the plaintiff and the defendant therefore relied upon this certificate in proceeding with the sale. Under identical circumstances, our brothers of the Second Circuit held that both the buyer and the seller could recover from the termite firm for the breach of its warranty upon which they relied in the sale, because the termite firm had negligently completed the termite inspection report incorrectly showing the premises to be free from the need of structural repairs because of termite damage. Ruehmkorf v. McCartney, La.App. *805 121 So.2d 757, certiorari denied. (The very purpose, of course, of the FHA requirement for a termite inspection was to discover extensive structural damage such as here existed.)
The conflict between the Second Circuit's holding in the cited case and the majority's holding in the present case thus apparently entitles the parties to a Supreme Court review of the question. In order to assist any further reviewing court in the examination of the record, the writer will therefore detail the conclusions he has set forth above by more specific reference to the transcript and the testimony.
To recapitulate, since the extensive termite damage at the time of the 1957 sale is unquestionably shown, the principal question of this third-party demand concerns whether or not the evidence in this record proves that the termite damage in the premises occurred following 1946 and during the existence of the termite-control contract service supposed to be provided by Blair.
Every expert testifying agreed that the termite damage in the Jordan house was not recent, that it was extensive enough to have required several years to have occurred (one expert estimating between three and seven years), and that by later examination (as here) it is impossible to date the termite damage or to estimate how long it has been present.
Because no expert can say by examination in 1958 whether the termite damage had occurred two years earlier, ten years earlier, or even twenty years earlier, able counsel for Blair contends that Mrs. Jordan has not borne a burden of proving that the damage occurred between 1946 and 1957, that is, during the existence of Blair's contract to control the termites in her premises. However, as a Florida court stated in rejecting somewhat similar contentions by a termite control operator, "If a party to a termite control contract should be held to the strict proof required by the contentions of the defendant in this case, such a contract would be futile as far as any protection to the property owner is concerned," Termitrol Engineers, Inc., v. Duncan, Fla.App., 112 So.2d 419, 421, 422.
For the reasons to be discussed more fully below, in my opinion, Mrs. Jordan, the homeowner, has satisfied any burden of proof she may have had by establishing at least a prima facie case that the termite damage was sustained after 1946 and thus during the existence of the protection supposed to be afforded her premises by the termite control contract executed by Blair, a licensed pest control operator; and the burden then shifted to that termite control operator to prove that such termite damages pre-existed his contractual responsibility to prevent themfailing which, as here, the termite control operator must under his contract be held liable therefor.
I think that Mrs. Blair has met her burden of proving that the termite damage was sustained during the term of the termite control contract from 1946 to 1957, for the following reasons:
(1) At the inception of the contractual service in 1946, Blair had personally made a detailed inspection of the house, including crawling underneath it. As the evidence reveals, such underneath examination is made with a good flashlight and a probing instrument, such as a screwdriver, knife, or ice-pick, during which the inspector examines generally the sills, joists, and other underneath supports for softness or signs of termite damage, and during which he especially examines visually and also by probing, areas especially susceptible to termites, such as bathroom and kitchen areas (where dampness is attractive to them) or near chimneys and other masonry supports (where they are attracted by the ability to go to and from the ground inside such brickwork, without the necessity of making mud tunnels to avoid the light). See, e. g., Tr. 177-179, 192, 363-364. At this time, the inspector not only checks for active termite infestation, but he also checks for extensive termite damage and reports *806 same to the homeowner, so that the homeowner may repair same. As Senator Blair himself ultimately admitted, he personally checked in 1946 and found no such extensive termite damage as would require repairs at that time.[2]
As a matter of fact, had Blair actually reported such extensive termite damage to the Jordans back in 1946 when he first undertook to furnish termite control for their premises, is it likely or even reasonably possible, within our ordinary experience of human behaviour, that the Jordans would have gone blithely on their way without investigating the matter further for some twelve years, such as by securing an estimate of the cost of the needed repairs? And if Blair had, as is intimated in the majority opinion, found such extensive repair-needing damage in 1946 or reported it to the Jordans, how possibly can we reconcile his firm's execution of the FHA termite inspection report in 1957 attempting to show, to the contrary, that the premises were not in need of structural repairs for termite damage since his firm had provided termite-control service for the premises over the previous decade?
Even though (as the majority notes) Blair had looked at and from the outside of the residence after the 1957 sale, he had not inspected under the Jordan house since the early 1950's (Tr. 368-369), nor did his files still have the record of this 1946 examination (Tr. 344) that termite operators usually make of the initial examination, by which at a later date it can be determined whether the then-present damage existed at the inception of the contract (Tr. 193). This witness could not, therefore, testify from his own knowledge whether the obvious termite damage found under the house in 1957 actually existed or not at the time he first inspected the house in 1946 and then undertook by contract to provide protection against further termite damage thereafter.
(2) Every expert witness except Senator Blair's employee testified that, in 1957 and shortly thereafter, upon inspection of the premises from underneath the house by the customary use of a flashlight and probing instrument, the extensive termite damage to the sills and floor supports was immediately obvious and substantial enough to indicate the need of structural repair. See testimony of: Paul K. Adams, entomologist and licensed pest control operator, testifying for plaintiff, Tr. 169-170, 172, 185, 187; James G. Ratcliff, general contractor, testifying for the plaintiff, Tr. 226-227, 234; James A. Gremillion, general contractor, testifying for the defendant, Tr. 251-252; P. Heflin, termite damage repair contractor, testifying for defendant, Tr. 278-279; James L. Broadwell, architect, who examined the house on behalf of Blair but testified on behalf of Mrs. Jordan, 293-294, 297-298; Ray Stubblefield, termite control operator testifying for Blair, Tr. 386, 391, 393-394. (Tom Skinner, a State termite inspector testifying for Senator Blair, stated that he found the termite damage under the house, Tr. 399, without being asked as to how obvious or extensive it was.)
It is chiefly suggested on behalf of Blair that the almost complete destruction of the sills leading from the chimney area, which is the principal portion of the damage complained of, could not readily have been ascertained, because it was on the outside edge of the sills and thus was covered by outside siding. Senator Blair further points *807 out that these siding boards are not customarily removed in the course of a termite inspection, even though this is a reasonably inexpensive procedure.
However, the other expert witnesses who had actually examined the underneath of the premises following the 1957 sale, while admitting that the removal of the sideboards made it much easier to observe the extent of the damage, were able simply by observation and probing underneath the house to determine that there was substantial structural termite damage. One of them stated flatly that it was substantial enough for the inspector to require that the weatherboard siding be taken off to observe the full extent of the damage (Tr. 251-252), another noted that by "sounding" near the chimney and discovering a hollow sound he discovered the damages even though the sideboards were not removed at the time of his examination (Tr. 279.)[3], and several noted that the springiness of the bedroom and porch floor over the deteriorated sills was an ascertainable sign of the termite damage (Tr. 190, 230-231, 259). It is to be remembered that chimney areas are especially susceptible to termites and therefore most thoroughly inspected when checking for termites or termite damage.
Since Senator Blair is a graduate entomologist and, as the record shows, is one of the most reputable and skillful pest control operators in the area, in view of the cited testimony it is virtually certain that he would have recommended repair or further investigation of the obvious evidence of termite damage found in 1957 by these other experts, had such damage actually existed at the time Blair inspected the house in 1946 and undertook thereafter to provide termite protection for it.
(3) Between 1946 and 1957 active termites were discovered five times in the Jordan residence. (Tr. 360; D-7, Tr. 109 110.) Approximately in 1950, they had eaten a three hundred dollar rug, which Blair replaced. (Tr. 335-336.) In April 1956 they did some slight bookcase damage, which Blair replaced. In 1957 Mrs. Jordan's real estate agent, immediately prior to the sale, again found some flying ants in the premises (Tr. 306-312), which Blair found were termites when immediately reported to his firm for inspection (Tr. 350). Several months after the 1957 sale, active termites in a "hidden infestation"that is, they came up from the ground through masonry pillars rather than through observable mud tunnelswere found by probing in the sill near the chimney (Tr. 174-175), although how long they had been active there was impossible to say.
Considering all this evidence in the record, it seems to me that Mrs. Jordan has borne her burden of proving that the termite damage found in 1957 had occurred after Senator Blair entered into the contract in 1946 to provide termite protection for her premises.
Aside from this third-party defendant himself, the chief witness offered for him was another termite operator, Ray Stubblefield, the substance of whose testimony was that the termites could not have damaged the premises since 1946 because, with annual and semi-annual inspections by Senator Blair's employees and with proper preventive poisons, such infestation and damage was not possible. This witness thought, for instance, that the presence of termites should have been observed by mud tunnels or their swarming in time to have eradicated or controlled them and have avoided their causing substantial damage. The force of this witness's testimony is considerably weakened, however, by the circumstance that, in fact, the swarming of the termites in these premises was observed several times in the years following 1946, *808 and also they were actually found shortly after the 1957 sale to be infesting the sills by a hidden infestation without having left any external traces such as mud tunnels.
Thus, for the foregoing perhaps toofully amplified reasons, I must respectfully dissent, firmly believing that my able and esteemed brethren of the majority are in error in dismissing the third-party demand by which the defendant impleaded the third-party defendant Blair and Great American, his statutory surety, for any termite damages for which the plaintiff obtained judgment against her.

On Applications for Rehearing.
En Banc.
PER CURIAM.
Applications for rehearing have been filed by Mrs. Jordan, the defendant-appellant, and by Cecil Blair, third-party defendant-appellee and also third-party plaintiff-appellant. In our original opinion we discussed and disposed of all of the contentions of Mrs. Jordan, but Blair points out that we did not specifically dispose of his third-party demand against his liability insurer for, at least, the costs of defending this action, although our judgment had the effect of rejecting such demand.
After Blair was impleaded as third-party defendant, by further third-party demand he impleaded as additional third-party defendant the Hartford Accident and Indemnity Company, his insurer from 1948 through 1958 under various comprehensive and manufacturers' and contractors' liability policies. The trial court sustained Hartford's exception of no cause of action and dismissed the third-party demand as against it. Blair and Great American appealed this dismissal.
Principally, able counsel for appellants urges that Hartford's policies had insured Blair for all sums for which he might become obligated to pay as property damages caused by "accident." Counsel argues that, under usual principles of policy construction in favor of the insured, such coverage contemplates the recovery of losses caused by events which are unexpected by the person who sustains the loss. See Knight v. L. H. Bossier, Inc., La.App. 1 Cir., 118 So. 2d 700.
We are unable to agree with the forceful and persuasive contention of able counsel. Conceding that insuring provisions where ambiguous are to be construed most favorably to the insured and so as to provide coverage, we cannot say that the policy's insurance of property damage "caused by accident" was intended to afford protection for termite damage when such damage was sustained over a period of years.
In the ordinary meaning of the term (which parties are sometimes presumed to intend when they contract, LSA-C.C. Art. 1946; Schonberg v. New York Life Ins. Co., 235 La. 461, 104 So.2d 171, 177), the term "accident" refers to "Some sudden and unexpected event taking place without expectation, upon the instant, rather than something which continues, progresses, or develops," 1 C.J.S. Accident at pp. 429-430. Whatever may be the meaning of the term in the context of other insuring agreements, in five out of six of the present policies (policies 2 through 6) issued by Hartford in this record, such a distinction is plainly recognized; for by special endorsement in each of them, issued for an additional premium, liability for damages from bodily injuries (but not for property damage) was extended to cover those caused by "occurrence" instead of "accident," "occurrence" being more broadly defined as also "a continuous or repeated exposure to accidentally caused conditions" (policies 5 & 6) or as a "continuous or repeated exposure to conditions" (policies 2, 3 and 4).
The cases cited by Blair's able counsel as holding that there was policy-covered damage as "caused by accident" concerned for the most part instances where the damage resulted from an "accident" within the *809 meaning of a relatively sudden unexpected event, as contrasted with damage gradually resulting from a continuous condition developing or progressing over the years. Further, the policies in question therein did not, as do those before us now, recognize in the policy itself the more restricted meaning of the term "accident" which we find to have been intended in the present instance.
Counsel cites several cases in support of the proposition that an accident is an event which happens suddenly and unexpectedly and without any design of the person injured, as distinguished from the person causing the damage. Jernigan v. Allstate Ins. Co., 5 Cir., 1959, 269 F.2d 353 on rehearing 5 Cir., 1959, 272 F.2d 857; Moore v. Fidelity and Casualty Company of New York, 1956, 140 Cal.App.2d Supp. 967, 295 P.2d 154; Ritchie v. Anchor Casualty Company, 1955, 135 Cal.App.2d 245, 286 P.2d 1000; Knight v. L. H. Bossier, Inc., supra. We are in accord with these findings. However, these cases do not concern instances where the damage occurred over a long period of time and therefore was not sudden.
Counsel also cites several cases in which the negligence or the condition causing damage was not sudden or else existed over a period of time. In each of these cases, however, the damage itself was sudden. Cross v. Zurich General Accident & Liability Ins. Co., 7 Cir., 1950, 184 F.2d 609 (damage to glass windows by strong solution used to clean exterior of building); Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (natural gas pipe was punctured which caused an explosion); O'Toole v. Empire Motors, Inc., 1935, 181 Wash. 130, 42 P.2d 10 (accident caused by failure of steering apparatus of an automobile); Koch v. Ocean Accident & Guaranty Corp., 1950, 313 Ky. 220, 230 S.W.2d 893 (fire caused by improper placing of header on breast of chimney). The case of this nature cited by counsel which this court finds most similar to the present is American Casualty Co. v. Harrison, D.C.W.D.Ark.1951, 96 F. Supp. 537. Evidently, however, the present issue was not presented to the court; see, 96 F.Supp. 546: "Frankly, the court does not fully understand this request of plaintiff, which has not been elaborated upon, but if plaintiff means that by this provision policy coverage is limited to those damages arising from accident in the sense of a mere happening without fault or negligence on the part of anyone, * * * as distinguished from damages resulting from negligence, the court rejects such * * * contention."
Mrs. Jordan's third-party demand impleading Blair alleges principally that Blair is liable to her because of his breach over the years of the termite control contract by which he had agreed to prevent termite damage to her premises. By the other cause of action pleaded, based upon Blair's breach of a warranty in a termite inspection report to the effect that there were no structural repairs needed because of termite damage, Mrs. Jordan does not allege any property damage caused by accident for which recovery is sought, but rather a loss sustained through mistaken reliance upon the warranty. Thus, under the allegations of Mrs. Jordan's demand against Blair, none of the damages for which recovery are sought by her against him are within the risks insured by the policy or covered by it.
As stated by our brothers of the Second Circuit in Kelly v. United States Fidelity & G. Co., La.App., 76 So.2d 116, 118, 119: "`Where the petition or complaint alleges facts which, if proved, would establish liability upon the insured, but with respect to which liability the policy clearly provides no insurance, there is no duty on the insurer to defend the action.' * * * (T)he liability to defend a suit against the insured does not attach and is not an obligation against the insurer if such suit makes a demand which is excluded from coverage under the policy. * * * (T)he duty of a liability insurer to defend a suit against its insured, whether groundless or not, is to be measured by the allegations of the declaration in said suit rather than by its outcome." See also Superior Cleaners v. *810 New Amsterdam Cas. Co., La.App. 1 Cir., 116 So.2d 195.
The trial court properly applied these principles to the case at bar and dismissed by exception of no cause of action Blair's third-party demand seeking to implead Hartford, his liability insurer.
For the foregoing reasons, both applications for rehearing are denied.
CULPEPPER, J., recused.
TATE, J., dissents from the denial of Mrs. Jordan's application for rehearing, for the reasons set forth in his dissent from the original opinion of the court.
NOTES
[1] The employee did the actual work; even seeing the nearly eaten-away sills at the trial, this witness still did not, contrary to every other witness, believe that repairs were needed. Blair of course could not personally know whether or not his employee had properly performed the termite control inspections and maintenance required by the contract.
[2] At Tr. 346:

"Q. But, Mr. Blair, isn't it true that when you go underneath a house, when somebody such as Mrs. Jordan calls you and asked you to check the termites and termite damage, isn't it true that if you find extensive termite damage that you bring that to their attention and recommend to them that they get somebody to make those repairs? A. That is correct.
"Q. Did you do that in this (interrupted) A. I feel positive we did because we called that to the attention of all for them to check it.
"Q. Well do your records disclose any particular damage that you called to her attention? A. I don't recall any, no.
[3] The plaintiff had discovered the termite damage by chance when he knocked on the siding near the chimney and discovered a hollow sound. He asked a carpenter working on his roof to take off the siding board and immediately saw that the sill to a great extent was destroyed.