191 So.2d 802 (1966)
Reuben F. GRAY et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF HIGHWAYS, Defendant-Appellant, and
W. R. Aldrich & Company and National Surety Corporation, Defendants-Appellees.
No. 1698.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1966.
Dissenting Opinion November 8, 1966.
Rehearings Denied November 29, 1966.
Writ Refused January 20, 1967.
Writ Granted January 20, 1967.
*805 D. Ross Banister, Philip K. Jones, Norman L. Sisson, William J. Doran, Jr., and Robert J. Jones, by Robert J. Jones, Baton Rouge, for defendant-appellant.
Fred W. Ellis, C. A. Miller, Jr., Lake Charles, for plaintiffs-appellees-appellants.
Porter, Scofield & Cox, by John B. Scofield, Lake Charles, Breazeale, Sachse & Wilson, by Hopkins P. Breazeale, Jr., Baton Rouge, John A. Hickman, Lake Charles, for plaintiffs-appellees.
Before TATE, HOOD, and CULPEPPER, JJ.
Writ Refused Gray et al., January 20, 1967.
Writ Granted State, January 20, 1967.
TATE, Judge.
The chief issue of this case is the legal measure of recovery by landowners against a State agency which unlawfully appropriates their property.
The State agency contends that the landowners' recovery is limited to the diminution of the market value of their property caused by the illegal appropriation, the same as if the property had been lawfully expropriated. If the illegal appropriation had been caused by a private person's similar disregard of property rights, the measure of the landowners' recovery would be substantially greater. A majority of this court holds that the State must likewise pay those greater damages when it illegally appropriates property.
Factual Context.
This suit is a sequel to State, Through Department of Highways v. Bordages, La.App. 3 Cir., 156 So.2d 617. (In this related Bordages suit, we are rendering a further opinion this date. 191 So.2d 797, Docket No. 1697.)
The present suit arose in connection with the construction of Interstate Highway 210 across a 650-acre tract of land owned in indivision by some 70 persons. Utilizing the "quick-taking" procedure provided by LSA-R.S. 48:441-48:460, in the Bordages suit the State Department of Highways had initially expropriated in September 1961 some 26 acres in fee for the new highway. At the same time it expropriated a temporary servitude for borrow pit purposes on an adjacent 22 acres of the parent tract. The borrow pit was to be used to obtain dirt for roadway fill. This initial taking was lawfully accomplished by prior deposit of $104,666, of which some $36,000 was for the borrow pit and the severance damages to be caused by this proposed borrow pit.
In June, 1962, eight months after the original order of expropriation, the Department by ex parte supplemental petition obtained an amendment of the order of expropriation in the Bordages suit. By this amendment the Department sought to expropriate, without making any prior deposit or payment, an entirely different area of 22 *806 acres on the west side of the highway in substitution for the 22 acres on the east side which had previously been lawfully expropriated through the original petition, deposit, and order.
The amended ex parte order was obtained on June 7, 1962. On June 13th and on June 18th, within two weeks, the defendant landowners filed exceptions and motions to rescind, as unlawful, the ex parte amended taking of the west 22 acres.
Despite these pleadings questioning the lawfulness of the substitute expropriation, the Department through its contractor on June 15th began clearing the west 22-acre borrow pit area described in the supplemental order.
It began hauling dirt from the pit on September 15th for roadway fill, and it continued to do so until June 1, 1963, when it completed its highway construction operations utilizing dirt from the borrow pit. The Department never used the borrow pit servitude on the highway's east side which had previously been lawfully expropriated.[1]
In the meantime, the District Court tried the landowners' demand in the Bordages suit to rescind the amended taking. On January 14, 1963, the court signed a formal judgment rescinding as invalid the amending order of expropriation, since it had been obtained without compliance with constitutional and statutory provisions requiring prior deposit or payment before a taking.[2] On the Department's appeal, this court on September 11, 1963 affirmed the trial court judgment. 156 So.2d 617, certiorari denied ("The judgment complained of is correct"), 245 La. 462, 158 So.2d 612.
Pleadings and Issues.
The present suit by Gray et als. was filed on June 5th, 1963, four days after the last dirt was removed. By it, the plaintiff landowners seek recovery both for the damage to the parent tract caused by the illegal appropriation of the borrow pit on the west side of the new highway right of way, and also for the manufactured value of the 120,000 cubic yards of dirt removed from the two borrow pits, 6-10 feet deep, excavated in the west 22-acre area described by the illegally taken servitude. The demand of the petition approaches $600,000.
Made defendants were the Department of Highways, the contractor (Aldrich) which had excavated the borrow pit at the direction of the Department, and also Aldrich's liability insurer (National Surety).
All defendants denied liability. The Department further reconvened to pray for an allowance of an offset against any award allowed the plaintiff landowners up to the amount of the compensation paid to the landowners for the properly expropriated (but unused) borrow pit on the east side of the highway. The Department claimed that otherwise the landowners would be unjustly enriched.
The trial court concluded that the plaintiff landowners' recovery is limited by law to the diminution in market value caused by the Department's illegal trespass upon and taking of their land; namely, $33,625. The trial court held the Department and the contractor Aldrich solidarily liable for this amount. It likewise dismissed the plaintiffs' claim against National Surety, the contractor's insurer, as not within the intended coverage of National Surety's contract of *807 insurance. Both the plaintiff and the Department appeal.
The principal issues raised by these crossappeals are:
I. The legal measurement of the recovery by the landowner for an unlawful appropriation of or trespass upon private property by the State or its agencies: Whether it should be the diminution in market value or instead the value of the dirt taken or the cost of restoring the invaded land to its condition prior to trespass.
II. The coverage provided by the liability insurance policy issued to Aldrich by National Surety: Whether the landowners' claim against Aldrich resulted from damages to property "caused by accident" so as to be within the insuring clause.
III. The Department's claim by its reconventional demand that it is entitled to an offset against any recovery by the landowners because of the latter's alleged unjust enrichment.

I.
The measure of recovery against the State for an illegal intentional taking of private property for a public purpose. Where a temporary servitude is lawfully expropriated for borrow pit purposes, the landowner's compensation is determined, not by the value of the dirt or gravel removed from his land, but by the taking's effect on the market value of his tract. State, Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6. But where one without valid title removes dirt from the property of another, then, as will be discussed more fully below, the measure of the true owner's recovery for the trespass may be the converted value of the dirt removed, the cost of restoring the property to its former condition, or such other award as will fully compensate the owner. See, e.g., East v. Pan American Petroleum Corp., La.App. 3 Cir., 168 So.2d 425.
In the trial court the Department successfully contended that for the illegal appropriation the present landowners cannot recover the greater damages awarded for intentional trespass but instead are limited to the market-value diminution allowed for a lawful expropriation.
This conclusion is based upon the erroneous assumption that the landowners can recover from the State the greater trespass damages only if the State's invasion of their property rights for a public purpose was inadvertent or unintentional. If on the other hand the taking was deliberate and intentional, the argument goes, then it is an eminent-domain taking for which market value is the sole measure of compensation. Thus, allegedly, the State must pay less for a deliberate and illegal damaging than for a merely negligent damaging of private property.
The Department deduced this erroneous conclusion from dicta or loose expressions in several inapposite decisions. The distinguishable issues decided in those cases concern, for instance:
(a) A negligent damaging by a governmental agency of property not physically appropriated or invaded, the cited decisions merely distinguishing the tort action thus involved from a cause of action for the intentional damaging of property for a public purpose (for which under Article I, Section 2, Louisiana Constitution, the property owner must be compensated by the State regardless of negligence on its part): Aleman v. Sewerage and Water Board, 196 La. 428, 199 So. 380; Marie v. Police Jury of Terrebonne Parish, La.App. 1 Cir., 161 So.2d 407; Beck v. Boh Bros. Const. Co., La.App.Orl., 72 So.2d 756; or
(b) The measure of the award (i.e., market-value diminution) for consequential damages caused by governmental action affecting private property which itself is not physically invaded or otherwise illegally *808 appropriated: Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354; or
(c) A good faith trespass by a private contractor, in which the court held the trespassing contractor liable for the value of the dirt ($16,005) rather than the diminution in market value ($6,044) caused by the tortious taking of dirt by the trespass: Derbofen v. T. L. James & Co., La.App. 4 Cir., 148 So.2d 795, 1 A.L.R.3d 793; or
(d) Trespasses by contractors working for a governmental agency, where in fact the measure of recovery for the landowner was not the diminution in market value of the tract but instead the value of the dirt taken from the property, Hebert v. T. L. James, La.App. 1 Cir., 72 So.2d 754, or the cost of repairing the damage caused to his property by the trespass, Cousin v. Hornsby, La.App. 1 Cir., 87 So.2d 157.
Many of the cited decisions do indeed concern the distinction between (a) a property owner's cause of action in tort for damages unintentionally caused by a governmental agency's negligence, and (b) his cause of action under the provision of Article I, Section 2, Louisiana Constitution, that: "* * * Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." (Italics ours.)
Where no lawful expropriation has taken place, the chief importance of this distinction is that the State and its agencies cannot be sued in the absence of a legislative waiver of the State's immunity from suit or tort; on the other hand, a cause of action under Article 1, Section 2 is regarded as constitutionally created and is thus permissible without legislative waiver. Angelle v. State, 212 La. 1069, 34 So.2d 321, 2 A.L.R.2d 666; Marie v. Police Jury of Terrebonne Parish, La.App. 1 Cir., 161 So.2d 407. However, the difference between the two causes of action does not necessarily mean that under the latter constitutional provision a damaged property owner may never recover other than the diminution in the market value of his property caused by an illegal taking; albeit this is the ordinary measure of compensation in a legally authorized eminent-domain taking by virtue of Article I, Section 2.
Angelle v. State, cited above, is the landmark decision of our state Supreme Court establishing the distinction between the two causes of action. The Court there expressly held that the only type of damages for which recovery is authorized under this self-executing provision of the constitution are those arising from "the intentional or purposeful expropriation or appropriation of private property for a public use or convenience", 34 So.2d 323, that is, "where the taking or damaging of the private property is intentional or occurs as a necessary consequence of the public undertaking", 34 So.2d 326. In so holding, the Court overruled some prior jurisprudence which had allowed recovery under the constitutional provision for damages to private property resulting merely from unintentional negligence in a governmental agency's performance of a public function or a public taking.[3]
In Angelle, however, our Supreme Court did expressly approve, as correctly decided, its earlier decisions in Booth v. Louisiana Highway Commission, 171 La. 1096, 133 So. 169, and McGeehan v. Board of Levee Com'rs, 165 La. 241, 115 So. 473.
In each of these cases, a governmental agency appropriated dirt from private property without legal authority. In both cases the court awarded the landowner the value of the earth removed from the land. In the subsequent Angelle case our Supreme Court pointed out that both of these earlier cases *809 involved an intentional taking or damage for public purposes, 34 So.2d 325, 326, and that for this reason the State was not immune from suit by the property owner to recover the type of property damage awarded them.
In the Booth case, approved by Angelle, our Supreme Court expressly rejected the contention that the State was liable only for the market value of the strip of land invaded ($75, or for ¾ acre taken at $100 per acre) and instead allowed the landowner the 1931 value ($400) of the 1,500 cubic yards of dirt removed. In Hebert v. T. L. James & Co., 224 La. 498, 70 So.2d 102, the intervenor Highway Department was ordered to replace earth taken from the yard of the plaintiff landowners and to restore their property to its condition prior to an illegal taking, where due to an error of law the intervenor Department and its contractor had without payment appropriated a servitude across the plaintiff's property. (Upon a subsequent appeal the plaintiffs were allowed to recover instead the value of the earth removed. 72 So.2d 754, La. App. 1 Cir.)
No decision cited by the Department limits a landowner's recovery against a governmental agency to the diminution in the market value of his property caused by the removal of dirt from it without authority of law. To the contrary, as noted, our jurisprudence has consistently recognized that the State no less than the least of its citizens is obliged either to restore to the landowner the value of dirt illegally removed by a trespass or else to restore his property to its prior condition, as well as to pay any other damages.
Article I, Section 2, of our state constitution was designed to protect the citizens against arbitrary or unauthorized governmental takings. We can see no justification to construe this provision as requiring a lesser award to an owner for the unauthorized taking of his property by governmental authority than would be allowed for the same illegal trespass by a private person.
If we interpret the constitutional provision as the Department suggests, the State may completely disregard constitutional provisions intended to protect private property from such unlawful governmental appropriation and yet pay the landowner no more than if it expropriated the property by legal procedures. Cf. Belgarde v. City of Natchitoches, La.App. 3 Cir., 156 So.2d 132. We are unwilling to construe the constitutional provision to be a limitation instead of a protection of the rights of private persons.
The plain intent of the article is to prohibit unauthorized governmental taking of private property. Where, as here, the State takes private property in violation of this constitutional prohibition, at the least the State must be liable for the same heavier measure of damages as would be assessed if the illegal trespass were committed by a private person. To hold otherwise would be to ignore the constitutional purpose of Article I, Section 2, which is to protect private property against unlawful government takings and also to provide fair and adequate compensation for all property taken for public purposes.
Other contentions regarding theory of recovery.
1. The Department cites some dicta from Cousin v. Hornsby, La.App. 1 Cir., 87 So.2d 157, to the effect that a landowner who fails to enjoin an unlawful taking is relegated to an action for the market value of the property taken. However, the landowner in Cousin v. Hornsby was actually awarded actual damages caused by the trespass rather than market value. Additionally, the actual jurisprudential holdings are contrary to this dicta in the Hornsby opinion.
Similar contentions have consistently been rejected when actually at issue. Reymond v. City of Baton Rouge, 145 La. 162, 82 So. 75; Sigue v. Texas Gas Transmission Corp., La.App. 3 Cir., 154 So.2d 800, certiorari denied; Williams v. Department of Highways, *810 La.App. 1 Cir., 92 So.2d 98, certiorari denied. The decisions recognize the owner's right to be restored to possession of his property unlawfully appropriated and to recover damages for its illegal invasion, even though the owner's protest after he learns of the trespass is only extrajudicial rather than by injunction.
In the present instance, the owners filed judicial pleadings contesting as unlawful the appropriation within two weeks of the ex parte taking, within a week of the actual physical invasion of the portion of their premises thus unconstitutionally appropriated without prior compensation. Where, despite knowledge of the owner's claim of the unlawfulness of the taking, the appropriating authority nevertheless takes possession and incurs expenses for the public purpose, it does so at its own risk. Reymond v. City of Baton Rouge, 145 La. 162, 82 So. 75.
2. The evidence indicates without question that the Department appropriated the landowners' property intentionally and for a public purpose. We have therefore found it unnecessary to discuss the landowners' alternate contention that, even if we held otherwise, they are entitled to maintain a tort suit for damages without securing special legislative waiver of the State's immunity. This argument is based upon the alleged general legislative waiver by LSA-R.S. 48:22, permitting the Department to sue and be sued, and upon our Supreme Court's recent construction of the 1960 amendment of Article III, Section 35, Louisiana Constitution in Hamilton v. City of Shreveport, 247 La. 784, 174 So.2d 529 as effectuating such waiver so as to obviate special legislative permission to sue for injuries caused subsequent to the amendment.
Legal theories concerning the measure of an owner's award when dirt is illegally removed from his land.
In the present instance, prior to the illegal appropriation, the Department had expropriated a 26-acre highway strip across the northeast corner of the owner's 650-acre tract. To the (north) east of this was the 22-acres including the legally expropriated, but unused, borrow pit.
The remaining 550 acres to the (south) west constituted a valuable industrial tract. Upon this remainder the Department took possession of the 22 acres illegally appropriated for borrow pit purposes, which area was immediately adjacent to the new highway. From it, the Department, through its contractor Aldrich, removed approximately 120,000 cubic yards of dirt, leaving two large excavations including about 16 acres.
The market value of the illegally taken borrow pit area was $1,600-$1,800 per acre. The borrow pit excavations rendered 16 acres virtually worthless and caused a loss in the market value of the remainder of the tract. We find no error in the trial court's finding, based upon the expert testimony, that the illegal taking caused a $33,625 diminution in the market value of the plaintiffs' land.
However, the landowners' recovery is not limited to this sum. As previously noted, they are entitled to recover the same award for this illegal taking as that for which a nongovernmental trespasser would be held liable.
The landowners contend that, most hopefully, they are entitled to recover the cost of restoring their premises to its original condition (i.e., $180,000-$200,000, the estimated cost of refilling and levelling the destroyed borrow pit area) or the delivered market value of the dirt used by the Department, plus the cost of re-levelling (i.e., about $250,000). The landowners point out the applicability of LSA-Civil Code Article 507, to be discussed more fully below, entitling the owner of construction materials used by another to reimbursement for the value of the goods used plus the payment of damages caused by the illegal taking.
*811 Where without the owner's consent one without authority of law has removed dirt from the owner's land, the jurisprudence is not entirely uniform as to the measure of recovery. The courts have adopted several principles of compensation, varying in application according to the circumstances.
Several recent instances include: The trespasser may be required to pay the cost of restoring the property to its original condition. Joseph v. Netherton Company, La.App. 3 Cir., 136 So.2d 556. Or the award to the owner may be measured by the cost of replacing the number of yards of dirt removed from his premises. Woods v. Slocum, La.App. 3 Cir., 179 So.2d 464. Or the owner may be entitled to recover the market value of the dirt as processed. East v. Pan American Petroleum Corporation, La.App. 3 Cir., 168 So.2d 426.
In all of the cited instances, the award to the owner was substantially in excess of the diminution in market value caused by the wrongful taking. As the decisions note, the court has some discretion in the measurement of an award for a wrongful taking, with the object being to fully compensate the true owner for the loss or damage to his property rights resulting from another's intentional physical invasion. Implicit in the reasoning is the principle that a defendant who takes or uses property of another, even in good faith, should not be allowed to profit by his wrongful act; and that the true owner, who is deprived against his will of his property, should not be limited to the nominal award sometimes represented by the mere diminution in market value caused by an intentional invasion of the fundamental right to be undisturbed in private property ownership. See also: Annotation, Measure of Damages for Wrongful Removal of Earth, Sand, or Gravel from Land, 1 A.L.R.2d 801, Section 4 (Louisiana rule) (1965); 87 C.J.S. Trespass § 121; 22 Am.Jur.2d Damages, Section 144.
Sometimes a further consideration in the award of damages has been the legal good faith or the legal bad faith of the trespassers who removed the dirt or gravel from land owned by another. DeHart v. Continental Land & Fur Co., 205 La. 569, 17 So.2d 827; Amite Gravel & Sand Co. v. Roseland Gravel Co., 148 La. 704, 87 So. 718; Derbofen v. T. L. James & Co., La.App. 4 Cir., 148 So.2d 795, 1 A.L.R.2d 793, see also State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145 (bad faith removal of salt). This line of Louisiana cases cited contemplates that in dirtremoval cases the courts should apply the same rule to determine the true owner's award as where timber is removed from his land without his consent, as evolved through the numerous Louisiana decisions on the subject.
Briefly, these jurisprudential timber rules award the owner of the timber a different measure of damages according to the good faith, the "legal" bad faith, or the "moral" bad faith of the trespasser: A good faith trespasser is liable for the value of the uncut timber in place (the stumpage value). The legal bad faith trespasser is liable for its value as converted or manufactured by the trespasser when sold by him, less his expenses of conversion or manufacture. The trespasser in moral bad faith is liable for this converted value, but without any deduction from the award for the costs or expenses of his conversion. See: Terry v. Butler, 240 La. 398, 123 So.2d 865; Motichek v. Perriloux, 231 La. 849, 93 So. 2d 190; Kennedy v. Perry Timber Co., 219 La. 264, 52 So.2d 847; Coastal Transmission Corp. v. Lejeune, La.App. 3 Cir., 148 So.2d 111.[4] According to these decisions, *812 the trespasser is in good faith where there is no reason for him to suppose other than that he has a legal right to remove the timber. However, even if he believes himself to be the owner, he is nevertheless in legal bad faith if he should have known otherwise from available information which would have placed a reasonably prudent man on notice. Additionally, he is also in moral bad faith if the trespass is reckless and willful.
In its most recent expression upon the subject, our Supreme Court explained in Terry v. Butler, cited above, that the reason for allowing this converted value "stems from the right of the owner to recover his property which has been illegally taken from him in whatever altered form it may have taken." 123 So.2d 871.
Aside from the various measures of recovery for illegal appropriation previously summarized, our Civil Code contains a provision which seems directly applicable to the present situation. LSA Article 507 provides: "If the owner of the soil [i.e., here, the Department] has made constructions, plantations and works thereon, with materials which did not belong to him, he has a right to keep the same, whether he has made use of them in good or bad faith, on condition of reimbursing their value to the owner of them and paying damages, if he has thereby caused him any injury or damage."
If this Code article is applicable, then the Department and its contractor who unlawfully appropriated dirt from the plaintiff landowners' premises are liable both (a) for the "value" of the dirt used in the construction of the highway and also (b) for any damages caused to the owner. The express intent of the Code article is to divest the former owner of his title to the materials used and of any right to recover them, but at the same time to entitle him to full payment for the misappropriated materials and any damages sustained. Planiol, Civil Law Treatise, Volume 1, Sections 2723, 2724 (LSLI Translation, 1959); Aubrey & Rau, Property, Section 204, par. 211 (LSLI Translation, 1966).
No Louisiana jurisprudence has developed the measure of the damages or of the valuation which the former owner is entitled to recover where the builder constructs works on his land with the owner's materials. However, in the converse situation, the Code provides that the bad faith possessor who makes improvements with his materials upon immovable property owned by another is held liable to the premises' owner by a stricter standard than is the good faith possessor. LSA-Civil Code Article 508. Likewise, in construing the parallel Civil Code articles regulating the rights of the respective owners where non-owned materials have been utilized in another movable product, LSA-C.C. Arts. 520-532, our Supreme Court has indicated that the material owner's recovery against one who in bad faith has converted the owner's property into another product is measured by the converted value of the product, not by the value of the materials prior to their conversion. Eastman v. Harris, 4 La.Ann. 193 (1849).
After considering the present facts and the jurisprudential and statutory principles summarized, we have concluded that LSA-Civil Code Article 507 is applicable here. The present plaintiff owners are therefore entitled to recover both the damages caused by the illegal misappropriation of the dirt, and also the value of the dirt thus misappropriated.
*813 We have also concluded that, in accord with code and decisional principles applied in similar situations, the valuation of the misappropriated dirt to be awarded here should be based, not upon its value before severance from the soil, but instead upon its value at the time it was converted into materials used in the highway construction, but less the costs of conversion. In reaching this conclusion, we have taken into consideration that the Department and its contractor Aldrich were at the least in legal bad faith in removing dirt from the premises of another after having been put on notice of the probable invalidity of the ex parte amended taking of the borrow pit servitude.[5]
Calculation of landowners' award in accordance with above principles.
(a) Valuation of dirt removed:
For purposes of clarity, we will note that there is a distinction in measuring commercial dirt between "borrow pit measure" and "truck bed measure". According to the present record, the difference is, with regard to the type of road-fill dirt here in question: 1 cubic yard, borrow pit measure, equals 11/3 cubic yard, truck bed measure; while 1 cubic yard, truck bed measure, amounts to only ¾ yard, borrow pit measure.[6]
Under the terms of the highway construction contract, Aldrich was paid 80¢ per cubic yard, borrow pit measure, to excavate the dirt and place it upon the highway bed. By exact calculation of the dirt used, the contractor excavated and hauled 117,351.6 cubic yards, borrow pit measure, for use as roadway fill.
The evidence is in accord that the converted value of the dirt, when excavated and hauled to the highway site, is $1.15 per cubic yard, truck bed measure. (The contractor's superintendent testified that this was the price paid for any dirt used on the job which had not been obtained from the borrow pit. Likewise, the landowners' dirt expert testified that this was the average price for ordinary road-fill dirt delivered at that time and in the area of the highway construction.)
The 117,351.6 cubic yards, borrow pit measure, of dirt delivered had a converted value of $1.15 per cubic yard, truck bed measure. The yardage of raw dirt, borrow pit measure, amounted to one-third more by truck bed measure (i.e., 39,117.2 yards more), as converted into road fill and delivered at the highway site; that is, to a total of 156,468.8 cubic yards, truck bed measure. The converted (i.e., manufactured *814 and delivered) value of this dirt, at $1.15 per yard, totals $179,939.12.
The expenses of this conversion amounted to 80¢ per cubic yard, borrow pit measure. This was the amount the State actually paid Aldrich to excavate and haul the dirt from the borrow pit to the construction site. At 80¢ per yard, the expenses of converting the 117,351.6 cubic yards of borrow pit dirt into road fill dirt and hauling it to the job-site totalled $93,881.28.
We have held that the landowners are entitled to the converted value of their misappropriated dirt, less the expenses of conversion: that is, to $179,939.12 less $93,881.28; or to $86,057.54 for the net converted value of the dirt misappropriated.
We may say that this award, amounting to 55¢ per cubic yard truck bed measure, is in line with similar awards made in the past for misappropriated dirt. See: Booth v. Louisiana Highway Commission, 171 La. 1096, 133 So. 169 (1931; 27¢ per yard); McGeehan v. Board of Levee Com'rs, 165 La. 241, 115 So. 473 (1928; 75¢ per yard); East v. Pan American Petroleum Corp, La. App. 3 Cir., 168 So.2d 426, 427 (1964; about 37¢ per yard, swamp muck); Hebert v. T. L. James & Co., La.App. 1 Cir., 72 So.2d 754 (1954; 80¢ per yard, road-fill).
(b) Damages to the premises:
The landowners claim that, for the additional damage to their premises, which they are entitled to recover under Article 507, the proper measure of recovery is the cost of restoring their premises to its original condition. They cite to us LSA-Civil Code Article 2315: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. * * *"
The landowners produced testimony that it would cost about $200,000 to fill the borrow pit excavations and to restore the land to its prior condition. However, the trial court found that the only actual diminution in the market value of the plaintiffs' tract caused by the taking was $33,625.
In an appropriate instance, the cost of restoring the premises might well be the proper measure of damages which should be assessed against one who unlawfully removes soil from land owned by another. See Joseph v. Netherton Co., La.App. 3 Cir., 136 So.2d 556. Here, however, the $200,000 cost of restoring the premises is very greatly in excess of the additional market value ($33,625) by which the tract would be enhanced by the restoration. Under such circumstances, the courts have instead allowed the landowner to recover the manufactured value of the dirt removed (see the Booth, East, and Hebert cases cited above), plus any damages sustained by the premises (see the cited Hebert decision).
Considering that we have awarded the landowner the value of the dirt taken from his premises, we think a proper award to the present landowners for the additional damages to his premises caused by the taking will be the diminution in the market value caused by such taking. See Schneidau v. Louisiana Highway Commission, 206 La. 754, 20 So.2d 14. We find no error in the trial court's determination that this amount is $33,625, measured by the beforeand-after market value.
(c) Recapitulation:
For the illegal appropriation, the landowners are thus entitled to recover (a) $33,625, the damage to their premises, plus (b) $86,057.84, the net converted value of the dirt removed; or a total award of $119,682.84.
The contractor Aldrich's liability.
The trial court found the contractor Aldrich, whose agents actually committed the trespass, solidarily liable with the Department, which caused Aldrich to commit the unlawful trespass. See LSA-C.C. Article 2324. Aldrich did not appeal this determination.
*815 However, by virtue of a hold-harmless agreement executed between the Department and Aldrich, Aldrich is also entitled to recover from the Department any amount for which cast. In its answer the Department admits that Aldrich and its insurer (National Surety) are entitled to recover from it any amounts for which they are held liable in this litigation.
Therefore, by reason of the increase by this court of the award in favor of the plaintiff landowners from $33,625 to $119,682.84, Aldrich is entitled to recover from the Department the additional amount for which it is held liable through this amendment of the award. The trial court judgment recognizes the Department's liability to Aldrich for all sums for which Aldrich is held liable in this litigation.

II.
The coverage afforded by the liability insurance policy issued to Aldrich by National Surety.
The trial court dismissed the plaintiffs' claim against the defendant National Surety, the liability insurer of the contractor Aldrich. The second principal contention urged by the plaintiffs' appeal is that the trial court erred in this dismissal.
National Surety had issued Aldrich a "comprehensive general liability policy" applicable to the construction operations in question. The insuring agreements of the policy provide for the payment of all sums within the policy limits ($100,000) for which the insured shall become legally obligated to pay "for injury to or destruction of property * * * caused by accident."
The trial court held that National Surety's policy did not cover the type of damages sustained here, on the basis that the damages did not result suddenly and therefore were not "caused by accident". In so holding, the trial court relied upon some language in Foreman v. Jordan, La.App. 3 Cir., 131 So.2d 796, 808-810. The appellee insurer apparently relies solely upon the correctness ot the trial court's holding in this regard, since we have been favored with no brief.
Our trial brother erred in applying the holding in Foreman v. Jordan to the present situation. There, the issue was whether termite damage causing gradual erosion over a period of years resulted from "accident", so as to be within year-to-year policies covering termite exterminating operations. The issue there concerned solely whether, within the applicable policy definitions, the damage resulted suddenly rather than from continuous exposure, so as to be an "accident" rather than an "occurrence".
In Foreman v. Jordan we specifically noted that we were in accord with the holdings in Knight v. L. H. Bossier, Inc., La. App. 1 Cir., 118 So.2d 700 and other cases cited "that an accident is an event which happens suddenly and unexpectedly and without any design of the person injured, as distinguished from the person causing the damage." 131 So.2d 809. We held those cases inapplicable, however, as not involving the Foreman v. Jordan situation, "where the damage occurred over a long period of time [i.e., years] and therefore was not sudden." 131 So.2d 809.
Unlike the Foreman v. Jordan situation, here the physical damage did result from specific incidents or acts on the part of the insured. We are not here concerned with the question of ascertaining whether the damage resulted from a definable incident so as to be caused by an "accident" in that sense of the word. See Couch on Insurance 2d, 44:282: "To constitute an accident, there must be a distinctive event that takes place by some unexpected happening, at a date which can be fixed with reasonable certainty."
Here, the damage resulted from "sudden" identifiable acts, the repeated digging of dirt by Aldrich's employees during the eight months the borrow pit was excavated. Had the damage resulted from a single scoop by a dragline, there could be no question that it was caused by accident in the sense *816 of being caused by identifiable incident. That instead of by one single scoop, the damage was caused by thousands of scoopfuls within a determinable period does not change the loss from being accidental in the sense of being caused by a distinctive event.
We therefore regard the holding in Foreman v. Jordan as inapplicable.
The more serious question before us is whether the damage here was caused "unexpectedly" as well as "suddenly", so as to be caused by "accident" within the "unexpected" sense of the term.
The American jurisdictions are divided as to whether damage intentionally caused by the insured can nevertheless be caused by "accident" because it is unexpected from the point of view of the person injured. Couch on Insurance 2d, 44:283, 284; Appleman Insurance Law and Practice, Section 4492 (1962). However, the Louisiana jurisprudence holds that an event is caused by accident if unusual and unexpected from the viewpoint of the person to whom it happens. Knight v. L. H. Bossier, La.App. 1 Cir., 118 So.2d 700 and decisions cited therein.
The ruling in the Knight cases is determinative of the present issue. There, a contractor's employees intentionally removed a fence belonging to a landowner. As a result, the landowner's cattle escaped, and he sued for the resulting damages. In holding there was liability coverage, the court in Knight held that, insofar as the landowner was concerned, the damage was unexpected and was thus caused by accident, despite the intentional nature of the several acts of the contractor's employees through their taking down 2½ miles of the landowner's fence. As noted, we approved the Knight holding in Foreman v. Jordan. See 131 So. 2d 809.
Also, even though the contractor's employees did intentionally remove the dirt, the damage for which the contractor is held liable may nevertheless from his point of view have been caused by accident insofar as attaching an unexpected legal liability to intentional acts. J. D'Amico, Inc. v. City of Boston, 345 Mass. 218, 186 N.E.2d 716 (1962); Haynes v. American Casualty Co., 228 Md. 394, 179 A.2d 900 (1962).
The real basis for determining whether or not an illegal removal of dirt is an "accident" within the meaning of the policy should be by ascertaining the intention of the parties. By a comprehensive general liability policy, a contractor seeks protection against the almost infinite ways in which he might unintentionally (i.e., by accident) be held liable in the operation of his business. The policy should afford protection against liability which, as here, arises out of conduct of the contractor which he undertakes without actually knowing or expecting that he will be held liable for damages as a result. In this sense, the unexpected loss to the landowner for which Aldrich is held liable is within the ambit of the protection intended to be provided by National Surety's policy.
The judgment will therefore be amended so as to hold National Surety solidarily liable with the Department and Aldrich, its insured, up to its policy limits of $100,000. However, by virtue of the "hold-harmless" agreement between the Department and Aldrich, see Article 12, Department's answer, National Surety is entitled to obtain judgment against the Department for any amounts for which National Surety is held liable in these proceedings.

III.
The Department's reconventional demand for a credit against any recovery allowed the plaintiff landowners.
The final issue is posed by the Department's appeal from the trial court's rejection of its reconventional demand. By it, the Department alleges that it should be allowed a credit against any recovery by the plaintiff landowners for the amount *817 paid them for the original borrow pit servitude. The Department contends that the plaintiffs will otherwise be unjustly enriched by payment for this servitude, since it was never used.
This was the borrow pit servitude affecting 22 acres on the east side of the highway, which was validly expropriated by the original petition and deposit of September 28, 1961. The present suit was precipitated by the Department's invalid attempt to substitute the 22-acre area on the west side of the highway for the east borrow pit area, and by the Department's unlawful appropriation of this west 22 acres instead of using the east 22 acres lawfully expropriated. See also companion suit, State, Through Department of Highways v. Bordages, La. App. 3 Cir., 156 So.2d 617 (Sept. 11, 1963) and 191 So.2d 797 (Docket No. 1697, rendered this date).
As the Bordages decisions make clear, the purported taking of the second borrow pit was completely invalid because of the Department's failure to comply with requirements of law, including a prior deposit of compensation.
Further, as to the first (or east) borrow pit servitude validly expropriated by the initial petition, the statute specifically provides that the Department "shall not be divested by court order of any title acquired under these provisions [of the "quicktaking" statute] except where the court finds that the property was not taken for a public use". LSA-R.S. 48:460. The uniform jurisprudence is to the effect that therefore the valid taking of the first 22-acre borrow pit servitude was not divested or rescinded by the subsequent ineffective amendment attempting to substitute a different (the west) area. See State, Through Department of Highways v. Bordages and also federal authorities cited in Footnote 5 above.
Under the terms of its expropriation order, the validly acquired (east) servitude was limited in duration to the completion of construction. The highway project was completed in May, 1964; and the Department or its contractors never used the east servitude prior to its termination through the expiration of the time for which granted.
In contending that the landowners were unjustly enriched by the $36,000 deposited for this original unused borrow pit, the Department principally contends that the borrow pit servitude originally expropriated had "failed for failure of delivery". The short answer to this contention is that, under the "quick-taking" statute, title to the servitude did immediately vest in the Department upon its deposit of the courtordered compensation.[7]
Although the Department did not see fit to use the servitude which it had expropriated, it nevertheless had the right to do so during the entire period of the servitude's duration. During this period, the landowners' tract was burdened with this valid servitude. The fact that the Department did not dig and remove dirt from that area did not render the servitude (the right to take dirt) less valuable.
We therefore conclude that the Department is not entitled to credit for the amount which it paid for the temporary servitude itself.
However, a majority of the court (not necessarily including the present writer) regards the deposit which was made for severance damages in a different light. This amounted to $8,360 estimated severance damages, which was included within the total $36,000 deposited for the original borrow pit servitude validly expropriated but never used.
LSA-R.S. 48:453 provides that the market value of the property actually taken *818 is determined "as of the time the estimated compensation was deposited in the registry of the court," but that the "damage to the remainder of the property is determined as of the date of the trial." When an expropriation proceeding is instituted initially, therefore, the Department must estimate the amount of severance damages which will be sustained as of a later date, that is the date of the trial, and it deposits in the registry of the court the amount of this estimate. The actual amount of severance damages may of course prove to be different on the last mentioned date than was anticipated when the deposit was made at the time of the taking.
In the Bordages suit the Department deposited the sum of $8,360 for severance damages which its appraisers estimated would be sustained by the landowners, assuming that the servitude area would be excavated and that large quantities of dirt would be removed from that area. Since no excavation was made and no dirt was removed from the servitude area, no severance damages were actually sustained by the plaintiffs as a result of the taking of the original temporary servitude. Plaintiffs thus have received a sum of money as severance damages which would not have become due to them had they contested the valuation by appropriate proceedings in the Bordages suit.
In the companion Bordages opinion decided this date (191 So.2d 797; Docket No. 1697), we have concluded that the Department could not claim a refund or return of the deposit because the landowners had not provoked a trial under the provisions of LSA-R.S. 48.451. In the view of a majority of this court, the fact that the Department could not claim a refund in that case because of a procedural complication does not prevent it from claiming credit in this suit by its defense of unjust enrichment because of excess amounts paid the landowners.
In the view of this court's majority, the Department's right to a credit, cf. LSA-C.C.P. Art. 424, against the landowners' award is based upon the following principles:
LSA-C.C. Art. 2301 provides that "He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it." LSA-C.C. Art. 2308 provides that "It is considered that a thing has been paid, when not due, if the payment was made by virtue of an agreement, the effect of which is suspended by a condition, the event of which is uncertain." Further, there is imbedded deeply in our civil law the maxim that no one ought to enrich himself at the expense of another. See LSA-C.C. Art. 1965; Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18. The substance of a plea of "unjust enrichment" lies in a promise, implied by law, that one will restore to the person entitled thereto that which in equity and good conscience belongs to him. Martin v. Bozeman, La.App. 1 Cir., 173 So.2d 382; Zurich Insurance Company v. Grain Dealers Mutual Insurance Company, La.App. 2 Cir., 169 So.2d 6.
Since the plaintiff landowners will otherwise be enriched by the $8,360 paid them by the Department for borrow pit severance damages which were never sustained, and since a majority has concluded there is no procedural bar to the Department's receiving credit for that amount against the award in favor of the landowners, the decree will be adjusted accordingly.
Conclusion and Decree.
For the reasons previously assigned: The award in favor of the landowners will be increased to a total of $119,682.84, less an offset for the $8,360 previously paid by the Department in the Bordages taking. The net award in favor of the landowners will thus be $111,322.84. Further, for these damages National Surety is solidarily liable, up to its policy limits of $100,000, with the Department and Aldrich.
Accordingly, the trial court decree is amended so as to increase the principal *819 award to the plaintiffs to One Hundred Eleven Thousand Three Hundred Twentytwo and 84/100 ($111,322.84) Dollars, with judgment against the defendants, Department of Highways, W. R. Aldrich & Co., and National Surety Corporation, holding them liable in solido for this amount (but with National Surety's liability on the principal amount limited to its policy limits of One Hundred Thousand Dollars). The trial court judgment is also affirmed insofar as it recognizes the right of Aldrich and National Surety to recover from the Department all amounts which they are required to pay by reason of judgment in favor of the plaintiff landowners in this suit. As amended in the respects indicated, the trial court's judgment is affirmed in all other respects, including its award of legal interest to the landowners. The defendants are to pay all costs of these proceedings and of this appeal.
Amended and affirmed.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
I am unable to agree with some of the conclusions which have been reached by the majority.
The Department of Highways excavated dirt from a portion of plaintiffs' 650-acre tract of land for use in constructing a highway, the area affected by these excavations comprising less than 16 acres. Plaintiffs, of course, still have full ownership of the property affected, and the only damage which they have sustained as a result of this particular taking is that a 16-acre borrow pit or pond is now located on a part of this large tract of land. The majority has found that the total value of the servitude appropriated by the Department, including severance damages, is $33,625. The Department has already paid plaintiffs the sum of $37,145 for a borrow pit servitude, that being more than the value of the rights actually taken, and plaintiffs have accepted that sum as full value for such a servitude. Yet, the majority has awarded plaintiffs the sum of $111,322.84 in addition to the amount which they have already received, making a total award of $148,467.84 for rights and severance damages which admittedly have a value of only $33,625. I cannot concur in such an award.
The majority has correctly found, as they must, that "the Department appropriated the landowners' property intentionally and for a public purpose," that plaintiffs have not obtained a legislative waiver permitting them to sue the state in tort, and thus that whatever claim plaintiffs may have against the state must come under and be governed by the provisions of Article 1, Section 2, of the Louisiana Constitition. In my opinion, however, my conscientious brothers have incorrectly concluded that the measure of recoverable damages in a suit against the state predicated on that constitutional provision is not the diminution of the market value of the property, as the Louisiana Supreme Court has repeatedly held, but instead that a governmental authority which intentionally appropriates property for a public use is liable in tort to the landowner under that constitutional provision to the same extent as would be a private person who illegally and in bad faith trespasses on the landowner's property. In my opinion, this last holding is in direct conflict with the well established jurisprudence of this state on that issue, and for that reason I must disagree with my colleagues in that holding.
Article 1, Section 2, of the Louisiana Constitution provides that "* * * private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." This provision of the Constitution has been generally regarded as being self-executing. Angelle v. State, 212 La. 1069, 34 So.2d 321, 2 A.L.R.2d 666. The measure of recoverable damages in a suit predicated on this constitutional provision is the diminution of the market value of the property; whereas *820 the measure of recoverable damages for injury to property by tort is the cost of restoration and the value of the lost use. Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354; Aleman v. Sewerage & Water Board of New Orleans, 196 La. 428, 199 So. 380; Hebert v. T. L. James & Company, La.App. 1st Cir., 72 So.2d 754.
In Aleman v. Sewerage & Water Board of New Orleans, supra, our Supreme Court said:
"A claim for compensation under the constitutional provision is wholly inconsistent with a demand for recovery in an action in tort. Negligence is not an element of recovery in the former case, whereas it is the basis of recovery in the latter case. The measure of recoverable damages in a suit predicated on the constitutional provision is the diminution of the market value of the property. Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354. On the other hand, the measure of recoverable damages for injury to property by tort is the cost of restoration and the value of the lost use. Sherwood v. American Railway Express Co., 158 La. 43, 103 So. 436." (emphasis added)
The Supreme Court also stated in the leading case of Angelle v. State, supra, that:
"In view of this, it becomes necessary to determine the meaning of the constitutional prohibition against the taking or damaging of private property `except for public purposes'. We think that the statement refers exclusively to the power of eminent domain, i.e., the intentional or purposeful expropriation or appropriation of private property for a public use or convenience. * * *" (emphasis added)

* * * * * *
"Counsel for plaintiffs argue that, since the Department of Agriculture was engaged in a systematic program for the eradication of sweet potato weevils, all acts of state agents in connection with the program were for a public purpose and that, therefore, it follows that any destruction of private property, though unintentional or unnecessary, is a taking of the property for a public purpose.
This argument is not sound because it fails to reckon a distinction between the destruction and damaging of private property by agents of the State while engaged merely in the performance of a governmental function and the deliberate taking or necessary damaging of property for the public use and benefit. In the first instance, the destruction or damage occurs not for a public purpose but by reason of the negligence of the state officers or agents. In the latter, the property is taken or damaged under the power of eminent domain; it is an appropriation for public purposes for which adequate compensation is guaranteed to the owner by Section 2 of Article I of the Constitution." (emphasis added)
In Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354 (1939), several earlier cases were discussed which consistently held that in suits against a governmental agency predicated on Article 1, Section 2 of the Constitution, the measure of damages is the diminution in value of the property. And in the Harrison case itself, after referring to that constitutional provision, our Supreme Court said:
"Under the provision of the Constitution above referred to, private property may not be damaged for public purposes without adequate compensation being paid therefor. * * * In such cases the measure of compensation is the diminution in the market value of the property." (emphasis added)
The facts in Cousin v. Hornsby, 87 So.2d 157 (La.App. 1st Cir. 1956), are similar to those presented here, although the circumstances presented there were much more favorable to plaintiff's cause than are the facts in the instant suit. In that case the *821 Policy Jury of St. Tamany Parish, through its contractor, dug a canal on plaintiff's property without permission to do so and without any court order or color of authority at all. Plaintiff protested before the work was started, but his protests were ignored. He did not take any legal action to enjoin defendants from continuing to dig the canal, but instead he waited until after the work was completed and then he sued for damages. Our brothers of the First Circuit held that under those circumstances plaintiff could recover only the amount that he could have recovered in an expropriation proceeding. The court said:
"In other words, the plaintiff, with knowledge that the contractor was going upon his land to complete the drainage system in accordance with his contract with the Police Jury, did not choose to legally prevent such action and he is therefore relegated to only an action for the value of his land taken and damages to his adjacent property. This is exactly what he could have gotten and what the Police Jury would have had to pay him had he forced an expropriation suit, and it is exactly what he can get according to the authorities, once the improvement is placed on his property."
As in Cousin v. Hornsby, supra, plaintiffs in the instant suit did not choose to enjoin the Department from excavating their land or in any other way to prevent it from removing dirt from the property. Instead, they waited until two days after the last dirt had been removed and then they filed suit against the Department for damages. Under the holding in the Hornsby case the plaintiffs clearly are relegated to an action for the value of the property taken and severance damages, as in expropriation suits.
In Schneidau v. Louisiana Highway Commission, 206 La. 754, 20 So.2d 14, the Highway Commission, without authority, appropriated a part of plaintiff's property for use as a borrow pit in the construction of a highway. Plaintiff sued primarily for a mandatory injunction to compel the Commission to fill up the pit, and alternatively he prayed for damages for trespass. Our Supreme Court affirmed the judgment of the trial court which rejected plaintiff's demands for the mandatory injunction and for damages for trespass, and held that as a result of this intentional appropriation for a public purpose, plaintiff was entitled to recover under the provisions of Article 1, Section 2, of the Constitution, only the value of the land taken and severance damages, as in expropriation suits.
In Beck v. Boh Brothers Const. Co., 72 So.2d 765 (La.App.Orl.1954), the owner of a residence sued an expropriating authority for damages to his residence. The suit was dismissed as to the expropriating authority because it did not involve an appropriating of property and thus plaintiff could not maintain the action under Article 1, Section 2, of the Constitution. In discussing that constitutional provision the Orleans Court of Appeal said:
"In connection with this argument we also notice that it is clearly stated in the petition that the claim is made for the cost of repairing the damage which is alleged to have been sustained and not for the diminution in the market value of the property which should be the basis of the claim under the constitutional provision relied on. Under this provision, where property is damaged, the compensation which is provided for is the depreciation in value and not the cost of making repairs. This was plainly held in Aleman v. Sewerage and Water Board of New Orleans, 196 La. 428, 199 So. 380." (emphasis added)
The above cited authorities show beyond any question, I think, that the measure of recoverable damages in a suit predicated on Article 1, Section 2, of the Constitution is only the diminution in market value of the property, or, as sometimes stated, the market value of the property taken plus severance damages to the remainder. Some of the other cases which also support this *822 view are: Derbofen v. T. L. James and Company, Inc., 148 So.2d 795, 1 A.L.R.3d 793 (La.App.4th Cir. 1962); Marie v. Police Jury of Terrebonne Parish, 161 So. 2d 407 (La.App. 1st Cir. 1964); Tate v. Town of Ville Platte, 44 So.2d 360 (La. App. 1st Cir. 1950).
The majority has brushed aside all of these authorities as being "dicta or loose expressions in several inapposite decisions". Instead, they rely on Article 507 of the Louisiana Civil Code, and on such cases as Booth v. Louisiana Highway Commission, 171 La. 1096, 133 So. 169; McGeehan v. Board of Levee Commissioners, 165 La. 241, 115 So. 473; Hebert v. T. L. James & Company, 224 La. 498, 70 So.2d 102, and 72 So.2d 754 (La.App.1st Cir. 1954); Belgarde v. City of Natchitoches, 156 So. 2d 132 (La.App.3d Cir. 1963); Joseph v. Netherton Company, 136 So.2d 556 (La. App.3d Cir. 1962); Woods v. Slocum, 179 So.2d 464 (La.App.3d Cir. 1965); and East v. Pan American Petroleum Corp., 168 So.2d 426 (La.App.3d Cir. 1964). In my opinion, none of the authorities or cases relied on by the majority are authority for the conclusions reached in this case.
In the first place, I cannot agree that LSA-C.C. art. 507 has any application at all here. If the redactors of the Code did intend for a governmental agency to be classified as the "owner of the soil," within the meaning of that article, then certainly insofar as expropriating authorities are concerned this article of the Civil Code has been superseded by Article 1, Section 2, of the Constitution.
The majority concedes that Angelle v. State, supra, is "the landmark decision of our state Supreme Court" on this issue. They state that in that case the Court did "expressly approve" the earlier cases of Booth v. Louisiana Highway Commission, and McGeehan v. Board of Levee Commissioners, supra. And then the majority proceeds to ignore the landmark decision, and instead it follows the two earlier cases which they said had been expressly approved. In the Angelle case the Supreme Court specifically cited eight cases which it felt compelled to discuss because of certain "pronouncements" in them which were contrary to the holding in Angelle. The Booth and McGeehan cases were included in these eight cited cases. I find nothing in the McGeehan case which supports the conclusions reached by the majority in the instant suit. Insofar as the Booth case is concerned, the court pointed out that the result was correct, but that the reasons assigned for it were wrong, the decision being based on obiter dicta in another of the eight cited cases (the DeMoss case) which "cannot be maintained." The language in the Booth case upon which the majority relies is the pronouncement which was specifically rejected by the Supreme Court in Angelle. See Comment, 9 L.L.R. 147, 165.
In Hebert v. T. L. James & Company, supra, the plaintiff landowner, unlike the plaintiffs in the instant suit, enjoined the Department of Highways from appropriating his property, and he then sued the contractor for the damages which were incurred prior to the time the injunction was issued. The trial court allowed plaintiff to recover damages, which included disturbance of possession and the cost of replacing the dirt which had been removed. On appeal, however, our brothers of the First Circuit Court of Appeal reversed all of the awards which had been made by the trial court except for one, that being the value of the land taken. In determining the amount of the award, the court said:
"In addition to the removal of the earth, a portion of plaintiff's shell driveway was destroyed and taking this into consideration with the quantity of dirt removed and the sloping of the boundary of plaintiff's property adjoining the highway, we are not prepared to say that the Trial Judge's allowance of $200 is excessive, and we approve that item."
The majority apparently cites the Hebert case as authority for the proposition that the Department may be ordered to "replace *823 the earth" taken from plaintiffs' property. As I have already pointed out, such a holding by the trial court was specifically reversed by the Court of Appeal.
In Belgarde v. City of Natchitoches, supra, the panel of this court which heard that case pointed out that insofar as actions for damages for trespass are concerned, a different rule is applied to municipalities than is applied to other governmental authorities. No application for rehearing was filed in that case and no applications for writs were submitted to the Supreme Court. In a comment appearing in 24 L.L.R. 961, the author points out, correctly I think, that this decision is contrary to the established jurisprudence of Louisiana. In any event, since a municipality was involved that case is not authority for the conclusions reached by the majority here that the State of Louisiana can be held liable in tort in an action predicated on Article 1, Section 2, of the Constitution.
The other cases relied on by the majority (Joseph v. Netherton Company; Woods v. Slocum; and East v. Pan American Petroleum Corporation) are all actions against private parties. They do not in any way relate to the liability of a governmental agency or an expropriating authority under Article 1, Section 2, of the Constitution, for property which has been intentionally appropriated for a public purpose, and thus none of these cases are applicable to the issues presented here.
I think the majority has erred in ignoring all of the established jurisprudence, and in holding that plaintiffs in the instant suit are entitled to recover more than the diminution in the market value of the property actually appropriated.
Although it is immaterial to the question of what is the proper measure of damages which are recoverable in a suit such as this, I also must take issue with the majority in their finding that the Department of Highways was in bad faith and that the Department can be classified and treated as an illegal trespasser for the purposes of assessing damages.
With reference to the question of whether the defendant may be treated as a trespasser, it is appropriate to note that on September 28, 1961, the Department of Highways obtained a formal Order of Expropriation granting to it, in addition to the 26 acres needed for the actual highway right of way, a temporary servitude for use as a borrow pit. This temporary servitude affected 22.22 acres of the landowners' property, located on the east side of and adjacent to the proposed highway. About eight months later, before any excavating work was done, the Department filed a "Supplemental and Amending Petition" in the district court in which it formally prayed for a change in the location of the servitude. A plat showing the site of the new servitude was attached to that petition. Pursuant to that pleading, the trial court issued a "Supplemental and Amending Order of Expropriation" on June 7, 1962, granting to the Department the new servitude, comprising 22.22 acres on the west side of and adjacent to the proposed highway, and it restored to the landowners the servitude which had been granted originally. The Department, acting under this formal amended order of expropriation, then began removing dirt from the new location on June 15, 1962, and continued to do so until the last dirt was removed from that pit on June 3, 1963. No excavating work has even been done of the original borrow pit area located east of the highway which was restored to the landowners.
On June 13, 1962, a curator ad hoc appointed to represent some of the absentee defendants in the expropriation suit filed a motion to dismiss the Supplemental and Amending Petition, on the ground that "the property was not expropriated for public use." It was not until June 18, 1962, three days after the excavating work was begun, that other landowners filed motions to dismiss, alleging for the first time as one of the grounds for that motion that the Department had not obtained a new appraisal *824 of the property before the amended order was issued. No questions had been raised as to any procedural defects in obtaining the amended order at the time the Department began excavating work, and the majority is in error in assuming that such an issue had been raised prior to that time. In excavating dirt from the west 22-acre tract, the Department was acting under the title and authority which was specifically granted to it by the court order of June 7, 1962, and that order was not rescinded until a later judgment "rescinding and recalling" it became final on December 16, 1963, several months after all the excavating work had been completed. The amended order of expropriation, which was issued on June 7, 1962, has never been decreed to be void or invalid. It was simply "rescinded and recalled" by the trial court on January 14, 1963, after the trial, and the judgment rescinding it became effective in December, 1963, long after the excavating work had been completed.
The Department, therefore, was authorized to remove dirt from the west 22-acre tract by a formal amended Order of Expropriation which remained in effect during the entire time the excavation work was being conducted. Even if the amended Order of Expropriation should have been decreed to be null ab initio, which is not the case, the Department still had the right to be on the property until the judgment decreeing it to be null became final. There was never an illegal trespass on plaintiffs' property at any time.
The majority has held that the Department was in "legal bad faith in removing dirt from the premises of another after having been put on notice of the probable invalidity of the ex parte amended taking of the borrow pit servitude." By this holding, my colleagues obviously mean that after the motions to dismiss were filed on June 18, 1962, the Department then should have known that the Amended Order of Expropriation ultimately would be recalled, and thus they were in bad faith in continuing to exercise the rights which had been granted to them by that order. I cannot agree with any such reasoning. A close legal question was presented in the action to rescind the amended order, and I, as the author of the opinion rendered by this court in that action (156 So.2d 617), did not find the question to be simple at all. I do not believe that the Department can be condemned as being in bad faith on the ground that it should have known all along that the order would be rescinded. The trial judge obviously had no such knowledge or suspicion when he signed the amended order, or he would not have done so.
The majority states that the location of the borrow pit was changed at the behest of "certain private interests," and there is an implication that this was done to favor these interests to the detriment of the landowners. I think such an implication is totally unjustified. After the original Order of Expropriation was signed representatives of a major industrial plant located east of the proposed highway informed the Department that the future plans of that company included expansion westward as far as the proposed highway, but that if the borrow pit should be located at the original site that portion of plaintiffs' property would not be useful or attractive to that industry. The Department, after investigating the matter, decided to move the borrow pit to the other side of the highway, where there were no nearby industries, where the land was less valuable and where there was no immediate need or demand for it for industrial purposes. The action of the Department in moving the location clearly was for the best interests of the landowners, and not because of any ulterior motives. This conclusion is supported by the evidence which was presented at the trial. The new servitude area was shown to be less valuable than the original location (the value of the new servitude being $33,625 as compared to a value of $37,145 for the original), and one of the real estate experts testified that the portion of plaintiffs' land located west *825 of the proposed highway (the area from which dirt actually was excavated) would be "the last reached in industrial development."
It is significant that the landowners did not at any time attempt to enjoin the Department from removing dirt from the west servitude area, although these operations were conducted over a period of almost a year. The reason for that, I believe, is that it obviously is more advantageous to plaintiffs to have the borrow pit on the west side of the highway. Private industries have no right of eminent domain. They must negotiate with the landowner. In this instance the Department has made changes which had the effect of increasing the usefulness and attractiveness of plaintiffs' property for immediate industrial development, and thus plaintiffs are now in a much better position to sell, lease or use the only portion of this land for which there appears to be an immediate prospect of development for industrial purposes.
In my opinion, the evidence shows that the Department has acted in the utmost good faith, and I disagree with the majority in their holding that it was in bad faith.
If it eventually should be determined that the majority is correct in its conclusion that plaintiffs are entitled to recover in tort against the state, and that the measure of damages is not the diminution in value of the property taken, but instead it is the "converted" value of each yard of dirt removed, computed by "truck bed measure" for some purposes and by "borrow pit measure" for others, then I still must disagree with the figures which the majority has used in making these computations.
The majority has found that the converted value of the dirt removed was $1.15 per cubic yard, truck bed measure. This figure was obtained, the majority says, from the testimony of the contractor's superintendent and the testimony of the landowners' dirt expert.
The contractor's superintendent testified that the contractor had paid that amount to John C. Richey on one occasion for dirt delivered on the job, but he points out that the haul distance for that particular dirt was "approximately fourteen miles." The contract between the Department of Highways and W. R. Aldrich and Company on this particular job provided that for digging and delivering dirt from a borrow pit furnished by the State, the contractor was to receive 80¢ per cubic yard plus a specified amount for hauling that dirt if the distance of the haul exceeded 2,000 feet from the pit. The formula for computing the amount due for hauling is somewhat complicated, but according to my figures the contractor would be entitled to receive the sum of $2.95 per cubic yard for dirt dug and hauled a distance of fourteen miles, even though the State was furnishing the dirt without cost to the contractor.
The landowners' dirt expert, E. T. Olson, testified that his delivered price for dirt dug from his own pit and delivered to the project would be $1.15 per cubic yard. But his pit is located seven miles from the job site, and he figured that the hauling costs alone would have amounted to 70¢ per cubic yard, truck bed measure, leaving him only 43¢ per cubic yard to pay for the digging, the drag line operations and for the land from which the dirt is to be excavated. I have already shown that under the contract W. R. Aldrich and Company receives 80¢ per cubic yard for simply digging dirt in the immediate vicinity, without this hauling expense. The delivered value of dirt, therefore, is determined largely by the cost of digging and hauling it, and the value of the dirt itself to the landowner is very small is comparison to the delivered price.
Mr. Olson further testified that the prices paid to landowners for fill dirt, such as was delivered here, varied "from 10¢ to 25¢ a yard," but that 10¢ "is a generally more accurate figure to the landowner than is twenty-five."
*826 The evidence convinces me that the value of the dirt removed in this case, if it is to be computed on a cubic yard basis, is 10¢ per cubic yard, or a total of a little less than $12,000. I cannot agree with the conclusions reached by the majority as to the value of the dirt which was removed.
Finally, I think the trial judge was correct in holding that the defendant, National Surety Corporation, is not liable under the policy of insurance which it issued to W. R. Aldrich and Company. That policy provides for payment of all sums for which the insured, Aldrich, shall become legally obligated to pay as damages to property "caused by accident." In Foreman v. Jordan, 131 So.2d 796, we held that the term "accident" refers to "some sudden and unexpected event taking place without expectation, upon the instant, rather than something which continues, progresses, or develops." In the instant suit, I agree with the trial judge that the excavating and removal of dirt from plaintiffs' property was not "caused by accident," and thus National Surety Corporation is not liable under the policy of insurance. I think the majority has erred in finding that the insurer is liable.
Considering the case as a whole, I think plaintiffs are entitled to an award of $33,625, less the sum of $8,360 which the majority concedes should be credited to the Department and deducted from any award made against it. This would make a net award of $25,265 in this case. I also could concur in a decree which would permit plaintiffs to retain the $37,145 which was paid to them at the time of the original taking, for the reason that the Department had the right to remove dirt from the east 22-acre tract for a period of time, and thus from a practical standpoint the property was removed from commerce during that time, although the rights possessed by the Department under that servitude were never exercised. If an award of $25,265 should be made in this case, that amount added to the sum which was previously paid would make a total payment to plaintiffs of $62,410 for the 16-acre borrow pit which is now located on their land. This amounts to more than twice as much as the full fee value of that tract before any excavating was done, and I think such an award would amply compensate plaintiffs for the taking. I cannot concur, however, in the award made by the majority in this case, which permits plaintiffs to collect and retain the sum of $148,467.84 because of the removal of dirt from this 16-acre tract.
For these reasons, I respectfully dissent from the judgment rendered by the majority.

On Application for Rehearing.
En Banc. Rehearing denied.
FRUGE, J., votes for rehearing.
HOOD, J., is of the opinion that a rehearing should be granted.
NOTES
[1] The record reflects that the substitution of the west 22 acres for the originally expropriated east 22 acres was at the bebest of certain private interests (not the plaintiff owners of the land, who were not consulted), who desired to preserve the eastern acreage's availability for their own contemplated acquisition for future industrial expansion.
[2] Louisiana Constitution, Article I, Section 2, Article IV, Section 15, Article VI, Section 19.1 (as added in 1948); LSA-R.S. 48:441 et seq.; LSA-Civil Code Article 497.
[3] In Angelle, for instance, the owners sued to recover for property destroyed by a fire resulting from the negligent performance of a governmental function. The Supreme Court held that in the absence of legislative waiver the State was immune from such suit.
[4] These timber rules and those applicable to the wrongful removal of minerals have been deduced by analogy from the Civil Code Articles relating to the obligations respectively of good faith possessors and bad faith possessors to restore the fruits or products of the property to the property's owner, or to retain movables constructed from materials which are the property of another. LSA-C.C. Arts. 499, 504, 520-532. The determination of good faith and "legal" bad faith is based upon Civil Code Articles (503, 3451, 3452), with the "moral" bad faith concept being drawn from common law sources. See Comment, The Measure of Damages for Unauthorized Production of Oil and Gas: The Role of Good and Bad Faith, 15 Tul.L.Rev. 291 (1941); Note, Removing TimberBad Faith, 5 Tul.L.Rev. 117 (1930); see also Yiannopopulos, Civil Law of Property, Section 137, esp. n. 241 (1966).
[5] The attempted rescission of the first taking and the substitution without payment of a second taking was invalid as completely unauthorized by statute for the reasons stated in State, Through Dept. of Highways v. Bordages, La.App. 3 Cir., 156 So.2d 617. Further, the Louisiana quick-taking statute is patterned upon the federal one, with the latter's interpretations being persuasive in construction of the former, State, Through Dept. of Highways v. Bordages; under the similar provision of the federal act, see 40 U.S.C.A. Section 258a, title vests in the United States upon the filing of the declaration of taking, and the federal jurisprudence holds that the proceeding cannot subsequently be abandoned or amended (as was attempted here) so as to rescind the taking and to deprive the owner of compensation for the value of the land included in the amount initially deposited. United States v. Sunset Cemetery Co., CA 7, 132 F.2d 163 (1942); United States v. 16.572 Acres of Land, More or Less, S.D.Tex., 45 F.Supp. 23 (1942), and cases therein cited. The Department has not been able, either in the Bordages suit or in the present, to cite any legal authority which justifies its attempted second (substituted) taking without payment.
[6] "Borrow pit measure" refers to measurement of the amount of dirt in place before it is excavated. "Truck bed measure" refers to the volume of dirt held by the truck, in which state the dirt is less compact and more loosened than in the ground. For this reason, according to the uncontradicted testimony, here the more compact cubic yard by borrow pit measure was expanded by one-third the original volume when measured by truck bed measure as loose earth. Tr. 702.
[7] LSA-R.S. 48:445 pertinently provides: "* * * Upon such deposit, title to the property and property rights specified in the petition shall vest in the department * * *."