BARHAM, Justice.
This is a suit in quanti minoris for diminution in the purchase price of the *635 property bought by the Frasers from the Amelings.[1] This is an action akin to red-hibition on the warranty against the vices in the thing sold that is imposed on the vendor by law. La.Civ.Code Arts. 2475, 2476, 2520, and 2541. A summation of the theory of the law is that the vendee seeks a reduction in the purchase price in the amount expended to repair the defect or vice in the realty purchased because that defect or vice diminished the value to such an extent that had the vendee been aware of the defect or vice, the realty would not have been purchased. Lemonier v. Coco, 237 La. 760, 112 So.2d 436 (1959).
Negotiations were entered through real estate agents for the sale to the Frasers of the house and lot at 2217 Wirth Place in New Orleans owned by the Amelings. When the Frasers’ offer of $26,000.00 was accepted by the Amelings, the Frasers’ real estate agent, Stan Weber, prepared an agreement to purchase. On the back side of the agreement was the following provision that was signed by all of the parties:
“If roof & termite[2] damage in excess of $100.00 is ascertained on an inspection which must be made within (3) working days of acceptance, this agreement will be null and void without expense to either party except that vendor shall reserve the right, at his option to pay any roof damage in excess of said $100.00, in which event the agreement of sale will be binding. Seller is to pay for inspection fee.”
This agreement was accepted on February 23, 1967, and the act of sale was passed on March 17, 1967. In the interim the roof damage was repaired to the Frasers’ satisfaction, but the termite inspection certificate was not received. Fraser called Bernard Freedman, the Amelings’ real estate agent, to ask about the certificate and was assured that it would be sent and that the inspection had been made. Within two days of the acceptance Freedman' called Billiot Bros., a termite exterminating company, which handled all of the inspections for Freedman’s real estate agency, and the inspection was made within a day or so after that call. The inspection included a checking of the wooden members of the stucco house, including framing, sills, and joists, and revealed old termite damage and live termites in the basement. No inspection certificate was prepared at that time; only a verbal report was given to Freedman that the damage was less than $100.00. No fee was charged by Billiot Bros, for the inspection. On the day of the sale Fraser inquired about the certificate and was assured by Harold Andry, an agent for Freedman, that the inspection had been made and that the agency had taken care of what Fraser had requested.
About 11 days after the act of sale was passed, Fraser wrote to Andry asking for the report on the termite inspection that was long overdue. Subsequently Fraser received an undated letter from Billiot Bros, stating: “The visible subterranean termite damage on property located at 2217 Wirth Place, New Orleans, should not exceed One hundred ($100.00) dollars.”
Not long after the passing of the act of sale Fraser was nailing something to an exposed joist in the basement, and the nail went completely through the joist. Noting that the damage was the result of termites, Fraser, through the attorney for his real estate agent, made demand on the Amel-ings. In a letter to Ameling dated April 24, 1967, the attorney stated that live termites had been discovered and some termite damage. An estimate of $250.00 was quoted to eradicate the termites and a “sum of several hundred dollars” was giv *636 en to repair the damage. The letter continued by stating that the basis of Fraser’s claim for recovery of these expenses was the “sale of the property with full warranty and the representations of your agent, Mr. Harold Andry, made on the day of the sale, in your presence and hearing, that the ‘termites were taken care of’ ”. No answer was received by Fraser. On May 18, 1967, Fraser entered into a service contract with Billiot Bros, for the treatment of his house for termites for a fee of $125.00 to include two years’ service. The rotten joist was replaced.
In October or November of that year Fraser discovered the extent of the termite damage while tearing out some walls in the basement.[3] In January, 1968, Fraser engaged I. W. Ricciuti, an architect, to examine the property and assess the extent of the damage. Ricciuti’s final report was not submitted until June 14, 1968, when by letter he informed Fraser that his inspection revealed “extensive damage to sills, joists and plates due to the presence of termites in the past”. The damage was shown by a plan that was attached to the letter. Ricciuti also noted that he believed there was additional damage which could not be appraised because of unseen construction. Ricciuti’s inspections were made visually with the aid of flashlights, knives, and picks and by sounding the wood. It was his opinion that the damage had been there for some time, having taken several years to occur. The damage that he discovered was primarily in the basement and in “open areas”, which he described as areas where the surface cover had been removed by Fraser or where there never had been a cover, such as exposed joists, studs, and sills.
While Ricciuti was determining the extent of the damage, Fraser hired Harold Barney, a general contractor, to repair the termite damage. Some of the work was done within the first two months of 1968; then in March an estimate was given to completely repair the damage. The cost of the repairs totalled $4200.00, and all of the work was done except for repair of the cracking of the walls which occurred when the house was jacked up to remove the top plate sills and joists. The cost for repairing the walls was fixed at $600.00. Barney found that the greatest damage occurred in areas that were covered from view, but that there were “little tunnels and splinters” in the open areas which were visible.
The house in question in this case is about 40 years old and situated in the uptown area of New Orleans. The house is stucco and built as a raised cottage with a basement. The basement where the substantial termite damage was discovered was divided into one large room with stained plywood panelling and wood flooring. and a small playroom and servants’ quarters, both of the latter unfinished with bare walls and concrete floors.
When the Amelings bought the property in 1943, there was old termite damage apparent in the basement, and there were also live termites. Ameling had the house treated and continued the treatments for several years, but then discontinued the service to avoid the expense. Only one damaged timber support beam was replaced by him during the period he lived there. After building a new home Ameling put this property on the market, and it remained empty for eight or more months *637 before the sale to the Frasers. It was during this vacant period that the roof damage occurred when Hurricane Betsy hit the city. Ameling had no knowledge of live termites in the house when he put it on the market.
Fraser went through the house at least twice before he purchased it and was on and about the premises on numerous other occasions. The Frasers lived nearby when they became interested in this property, and he visited the property frequently. On these visits Fraser did not notice termites or termite damage. Mrs. Fraser acknowledged that she saw some termite damage on her first visit to the property but no live termites.
This suit was filed when the Amelings refused to pay the sum demanded by the Frasers. The district court dismissed the suit stating in its reasons for judgment that this case was factually identical to Bonhagen v. Hooper, 195 So.2d 447 (La.App. 4th Cir. 1967), writs refused 250 La. 634, 197 So.2d 652 (1967), which rejected the demand for reduction of the purchase price paid due to damage to the house caused by termites. The Court of Appeal affirmed, 259 So.2d 95, but not on the rationale of Bonhagen. That court found that since the Frasers knew of partial infestation and were alerted to the possibility of more extensive damage, they did not act as reasonably prudent persons when they failed to take action to determine the exact condition of the house. The Court of Appeal concluded that the clause in the agreement to purchase did not give the Frasers any greater rights than are generally recognized in an action in quanti minoris. It was noted that the clause provided only that the agreement was null if the inspection showed termite damage in excess of $100.00. The inspection did not make such a finding, and there was no additional guarantee by the inspector or the Amelings regarding the inspection, according to the Court of Appeal, to merit recovery for the damage. The Court of Appeal ended its opinion by suggesting the adoption of a new rule in cases such as this: “one who purchases a home in which there is some evidence of termite activity does so at his own risk.” [4]
In Pursell v. Kelly, 244 La. 323, 152 So. 2d 36 (1963), this court laid down the test to be applied when a reduction in the purchase price is sought as a result of damage caused by termites. Guided by Civil Code Article 2521, the court announced the following test: “The proper test to be applied to this case, we think, as in all other cases of this kind, is whether a reasonably prudent buyer acting under similar circumstances, would have discovered the presence of termite damage in the premises.” In that case Pursell had purchased a 40-year-old wood frame house with such defects as bowed and leaning outside walls, slanting and shaky upstairs room, sunken foundation, and sidewalks below grade from soil subsidence. As to the termite damage it was noted that “a superficial examination was sufficient to disclose that the building, and particularly the lower floor, was infested with termites, ‘in other words you could see that as you walked in and went on the side’ ”. Recovery was refused.
In Bonhagen v. Hooper, supra, the Fourth Circuit Court of Appeal attempted to determine the necessary guidelines for the reasonably prudent buyer. In that case, however, the purchase agreement contained a stipulation that the agreement was subject to the purchaser’s being able to “termite proof and make essential structural repairs due to said termite damage to the property at a cost not in excess of $300.00”. Bonhagen called in four pest control experts and was assured that treatment of subterranean infestation would not exceed that amount, but no estimate of structural damage was made by a eontrac *638 tor or repairman. After the purchase Bonhagen discovered the extent of the damage and attempted to have the purchase price reduced in the amount of the costs for repairs. That court rejected the claim, reasoning that with the information Bonhagen did have about current infestation and old damage he was required to investigate further even if it required “defacing the house”.
In this suit the Frasers have placed great reliance upon the clause in the purchase agreement which required a termite inspection. The language of that clause and the circumstances brought out at the trial illustrate, however, that this provision was never intended to guarantee against termite defects in the property. All that was demanded by the Frasers was that the property be inspected for termites and that they be assured that the cost of eradication would not exceed $100.00. The Court of Appeal was correct in its interpretation of the clause in the agreement. This case is unlike Bonhagen, where the vendee assumed the responsibility of determining that eradication and structural repairs would not exceed $300.00.
 The Frasers cannot rely upon the clause in the contract to support their claim for diminution of the purchase price. While that provision does not support their claim, neither does it bar the claim. It is basic under our law that the seller warrants against “hidden defects of the thing sold or its redhibitory vices”. La.Civ.Code Art. 2476. When the defect or vice renders the thing sold either absolutely useless or makes its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it had he known of the vice, the buyer may demand reduction of the price. Arts. 2520, 2541. It is under this general rule of law that the Frasers’ claim must be considered, subject to the rules and limitations of the redhibi-tory action. Art. 2544.[5]
The pertinent limitation to be applied here is found in Article 2521: “Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibi-tory vices.” In the Pursell case this court held that the “simple inspection” was to be made by “a reasonably prudent buyer”. In light of this criterion it cannot be said that the Frasers, acting as reasonably prudent buyers, would have noticed the extensive termite damage by a simple inspection of this property. In three appellate decisions it has been noted that special knowledge is not to be attributed to the ordinary buyer when making a simple inspection for the discovery of apparent defects caused by termites. Ruehmkorf v. McCartney, 121 So.2d 757 (La.App. 2nd Cir. 1960); Foreman v. Jordan, 131 So.2d 796 (La.App. 3rd Cir. 1961), writs refused, No. 45825 on our docket; Thompson v. Klein, 188 So.2d 180 (La.App. 4th Cir. 1966). This point is well taken. The buyer cannot hold the seller accountable for the obvious defects that the ordinary layman would note, but the seller does warrant against the hidden defects. Thus there is no obligation on the part of the buyer to inspect with expertise or to “deface” the thing purchased while inspecting it.
The Amelings lived in this house for about 24 years, and although treatments for live termites were- made initially, they had no knowledge of the extensive damage that had been caused or was being caused by termites. At the time the property was put on the market, Ameling did not even know that there was active termite infestation. The architect, the general contractor, and the exterminator all testified that structural damage could only be fully determined by removal of the surface cover *639 ings. The fact that some old termite damage was visible to anyone did not necessarily put the laymen, or even the experts, on notice that there might be major termite damage.
The damage that was visible in this case was some dry holes or tunnels in some of the structural members exposed in the basement. Even if it is assumed that this type of damage was visible without a specific search for such signs of termites or without the aid of a flashlight and knife or pick, it can hardly be said that this damage would have put the reasonably prudent person on notice that there might be extensive termite damage requiring further investigation. Unlike the house purchased in Pursell, this house was basically sound from a visual standpoint, although it was an old house. The experts were unable to determine the real defect complained of, that is, the substantial termite damage, except by using special expertise. The Fras-ers, therefore, are entitled to recovery.
As noted by this court in Lemonier v. Coco, supra, and Pursell v. Kelly, supra, the measure of recovery when the thing sold is realty is the amount necessary to convert the unsound structure to a sound one. Here the bid for repair of the damage caused by termites is $4200.00. An argument is made that the sum is out of proportion to the value of the house when the house is considered separately from the land. The evidence offered at the trial to support this argument was just a general estimate of the square-foot value of the land in that area. It lacked any definite quality. There is nothing to show that the cost of $4200.00 for repairs is disproportionate to the value of the house because the Frasers paid $26,000.00 for the house and lot. Undér the evidence special consideration is not required by this argument for possible modification of the award.
For these reasons the judgment of the Court of Appeal is reversed, and Mr. and Mrs. John C. Fraser are awarded $4200.00 against Mr. and Mrs. William J. Ameling. The costs are to be paid by the respondents.

. The Amelings named as third party defendants Melvin Billiot and Paul Billiot, doing business as Billiot Bros., and Billiot Bros., Inc., seeking indemnification should the Amelings be cast. The third party demand was dismissed by the district court, and no appeal was taken from that portion of the judgment. That matter is now final and not before this court.

. The words “& termite” were inserted by hand on the printed agreement.

. The following testimony was given by Fraser:
“A. About October or November, 1967 is when it became very apparent that the house was substantially damaged by termites.
“Q. How did it become apparent?
“A. I was tearing out some walls in the basement in preparation to do some remodeling and the more we tore out the more apparent termite damage became. There mas some termite damage apparent in joists — overhead joists prior to that which I did not consider at that time to he significant. I had one joist replaced in the house shortly after purchasing it and I assumed at that time that that was the extent of it but upon further investigation, the substantial termite damage became very evident.” (Emphasis supplied.)

. The Frasers argue that the Court of Appeal applied this rule in this case, hut it is apparent from the opinion that this contention is without merit.

. The Court of Appeal in its opinion in this ease suggested an assumption of risk theory for determination of this and similar eases. The Civil Code, however, expressly provides the theory by which such cases are to be decided. There is no valid basis for a distinction to be made between hidden termite damage and other types of concealed damage that would merit an action in redhibition.